2023 IL App (1st) 211145-U

Nos. 1-21-1145, 1-22-0176, 1-22-1711, 1-23-0802 (Cons.)

Second Division
December 29, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| IN RE MARRIAGE OF: | ) | Appeal from the |
| | ) | Circuit Court of Cook County |
| NAWARA TARBOUCHE, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 2015 D 230385 |
| | ) | |
| FAWAZ (FRANK) ENNAB, | ) | Honorable |
| | ) | Regina Scannicchio, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Trial court's dissolution judgment pursuant to the Illinois Marriage and Dissolution of Marriage Act is affirmed where the court properly: (1) ordered respondent-appellant husband to designate petitioner-appellee wife as a beneficiary on a life insurance policy; (2) ordered husband to reimburse wife for health insurance expenditures during dissolution proceedings; (3) determined that $145,000 gift did not constitute income for purposes of maintenance calculations; (4) considered wife's employment history for purposes of income computation for maintenance calculations; and (5) ordered husband to pay retroactive temporary maintenance to the date of the petition for dissolution's filing. The trial court's judgment is reversed

where the court failed to follow statutory notice requirements regarding dissipation of marital assets. The trial court's judgment is reversed and remanded where the court did not order retroactive maintenance to be paid out of the marital estate.

¶ 2    This case comes before us following almost six years of marriage dissolution proceedings in the circuit court of Cook County pursuant to the Illinois Marriage and Dissolution of Marriage Act (Act), 750 ILCS 5/101, *et seq.* (West 2014). Following years of pretrial litigation and motion practice, a bench trial was held on petitioner-appellee, Nawara Tarbouche's petition for dissolution of marriage against respondent-appellant, Fawaz "Frank" Ennab, which was granted on December 7, 2020. Therein, the trial court held that: (a) Nawara was entitled to both prospective and retroactive maintenance, the latter to begin from the date of her petition's filing; (b) Frank was to reimburse Nawara for out-of-pocket health insurance premiums she incurred after removing her from his insurance plan during dissolution proceedings; (c) Frank had dissipated marital assets; and (d) Frank was to maintain a life insurance policy with Nawara as his beneficiary.

¶ 3    Frank timely filed a motion to reconsider, which was granted in part and denied in part on August 18, 2021. Specifically, the court modified Frank's maintenance obligations after imputing an income of $25,000 to Nawara, but maintained its original ruling that Frank was obligated to pay retroactive maintenance to the date of the petition's filing. The court further affirmed its previous holding that Frank had dissipated assets.

¶ 4    Frank now appeals that order, arguing multiple issues on appeal, namely that: (1) the trial court erred in its calculation of Frank's maintenance obligations by improperly calculating Nawara's income; (2) the court improperly imposed a retroactive maintenance award beginning from the date of the petition's filing; (3) the court erred in requiring Frank was to maintain a life insurance policy with Nawara as a beneficiary; (4) the court's dissipation finding was improper where Nawara's notice of dissipation of assets was untimely; (5) the court erred in determining

that Frank had to reimburse Nawara for her health insurance premiums; and (6) the court incorrectly denied his motion to reconsider. For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings.

¶ 5                                    I. BACKGROUND

¶ 6      We derive our factual background from the underlying petition, the parties' extensive motion practice, the testimony derived at trial, the dissolution judgment, the trial court's order following Frank's motion to reconsider, and the multiple consolidated appeals filed by Frank.

¶ 7                                  A. The Underlying Facts

¶ 8      At the time of trial, Nawara was forty-eight years old and a resident of Evanston, Illinois, and she held citizenship in the United States and Syria. She was a licensed registered pharmacist in Illinois, but was unemployed for most of the dissolution proceedings. Frank was fifty-nine years old and resided in Chicago, Illinois, and held citizenship in both the United States and Jordan. Frank had multiple master's degrees and was employed by Oracle Corporation. Nawara and Frank were married on December 28, 1993, in Las Vegas, Nevada, and later moved to Illinois in or around 1998. The marriage resulted in two now adult children, Dina and Nadia.

¶ 9                                   B. Procedural history

¶ 10                                  *1. Nawara's Petition*

¶ 11    On September 18, 2015, Nawara filed a petition for dissolution of marriage (the petition) based on "irreconcilable differences." The petition alleged that the parties had lived separately for over two years, and that Frank had exhibited "repeated and unprovoked mental cruelty towards" Nawara. The petition sought the division of marital and non-marital property, joint contribution of their children's post-secondary education and related expenses, and maintenance paid by Frank to

Nos. 1-21-1145, 1-22-0176, 1-22-1711, 1-23-0802 (Cons.)

Nawara. On January 6, 2016, Frank filed a *pro se* appearance, and later retained an attorney who filed an appearance on February 11, 2016.[1]

¶ 12    During the course of the litigation, the parties submitted various financial affidavits and documentation concerning their claimed assets. Of relevance here, per Nawara's 2019 financial affidavit, the following real properties were claimed as marital assets: (1) 918 Hinman Avenue, Unit A, Evanston, Illinois (Unit A); (2) 175 East Delaware, Chicago, Illinois (the Delaware property); and (3) 2500 N. Lakeview, Chicago, Illinois (the Lakeview property), all of which were encumbered by mortgages.[2] The record also showed evidence of a property owned by Frank as a "single person," at 918 Hinman Avenue, Unit B, Evanston, Illinois (Unit B). The parties also submitted evidence of various bank accounts, federal income tax returns and W-2's, Frank's health insurance policy and retirement accounts at Oracle, and Nawara's efforts to find employment following the closure of her employer's business in or around December 2016.

¶ 13                        2. Motion Practice and Relevant Orders

¶ 14    The parties engaged in many years of motion practice, ranging from issues concerning the parties' alleged possession of assets in Syria and Jordan; Nawara's potential holding of a Swiss

---

[1]According to the trial court in its dissolution judgment, and as confirmed by our own investigation, Frank never filed a responsive pleading to the petition, despite being ordered to do so in February 2016. Section 105 of the Act was amended in 2016, after the filing of Nawara's petition, but provided at the time that any responsive pleading to the filing of a petition would be deemed a response. See Pub. Act 99-10, § 5-15 (eff. Jan. 1, 2016) (amending 750 ILCS 5/5105). Now, Section 105(c) defines "pleading[]" as "any petition or motion filed in the dissolution of marriage case which, if independently filed, would constitute a separate cause of action[.]" *Id.* § 105(d) (West 2016).

[2]Nawara also listed ownership of various properties in Syria and Jordan, which shall be discussed later.

bank account; Frank's failure to comply with discovery obligations; and new counsel for both parties.[3] We recite the relevant motion practice as it pertains to the issues on appeal.

¶ 15    On May 9, 2016, by agreed order, Nawara was given exclusive possession of the parties' residence at 918 Hinman Avenue, Unit A, in Evanston, Illinois (Unit A). Nawara was to be solely responsible for all expenses related to the residence beginning April 1, 2016, onward, which included: (a) Unit A's mortgage; (b) its quarterly condominium association fees; (c) property taxes and utilities; and (d) all routine expenses and repairs.

¶ 16    Sometime in 2016, Frank filed a motion for release of sales proceeds, seeking to release funds to repay one of their daughter's college loans. Therein, Frank stated that in 2010, the couple had purchased Unit B as an investment property, which was held solely in Frank's name. Unit B was sold in July 2016, and the proceeds remained in a bank account held by Frank pending the end of the litigation. On January 6, 2017, by agreed order, Frank was authorized to withdraw all necessary amounts to various college-related expenses.[4]

¶ 17                              a. Discovery Deadlines and Related Issues

¶ 18    On February 13, 2019, following multiple discovery deadline extensions, the trial court imposed a final deadline of May 31, 2019. However, on May 31, 2019, the parties' counsel exchanged emails indicating "an agreement to mutually extend discovery" and that a schedule would be further discussed regarding outstanding matters and the parties' depositions. Subpoenas for the parties' depositions were subsequently issued on June 10, 2019, and June 24, 2019.

---

[3]A substantial portion of the record also demonstrates that various sanction orders were entered by the trial court against Frank and his counsel of record. Because the current issues on appeal do not directly touch upon those orders, we will not recite them here.

[4]Similar motions were further brought by Frank during the pendency of the case to release funds to pay for college-related expenses or property taxes, which were either granted by the trial court or entered by agreed order.

¶ 19     Despite the deadline, Frank continued to issue various subpoenas to Nawara, and Nawara filed various emergency motions to quash the subpoenas in addition to multiple requests for sanctions. Of relevance here, on August 26, 2019, after granting Nawara's emergency motion to quash a set of subpoenas issued to Bank of America, the following exchange occurred in court:

> "THE COURT: There is a trial order in this case that closed discovery on a particular date, correct?
>
> [Both petitioner and respondent's counsel respond affirmatively]
>
> ***     ***     ***
>
> [Respondent's counsel]: Trial order, discovery closes May 31, 2019.
>
> THE COURT: So why would it be appropriate for any counsel in this case to issue a subpoena for records subsequent to May 31, 2019, without leave of court?
>
> [Respondent's counsel]: Well, [petitioner's counsel] and I had agreed that we should take depositions—
>
> THE COURT: Counsel, you can agree about depositions, and you can agree with respect to certain items. Was there an agreement that discovery—written discovery remained opened in this case? And let's make no mistake there are rules that need to be followed, Illinois Supreme Court Rules, the Illinois Code of Civil Procedure. So I am asking simply was that May 31, 2019, discovery closure date modified in any way?
>
> [Both petitioner and respondent's counsel]: No."

¶ 20                    b. Nawara's Motion for Temporary Maintenance

¶ 21     On May 8, 2019, Nawara filed a motion for temporary maintenance and reinstatement to Frank's health insurance policy pursuant to sections 501 and 504 of the Act, 750 ILCS 5/501,

5/504 (West 2018). First, Nawara sought temporary maintenance payments from Frank as she claimed to have recently lost her job at a local pharmacy following the business's closure, and was now unemployed other than occasional part-time work as a substitute pharmacist. Nawara admitted to owning various real estate parcels in Syria, but such properties did not generate any income and she did not have any large accounts or investments upon which to rely. She further asserted that she was currently living off money provided to her by her mother. Second, Nawara sought immediate reinstatement to Frank's employer-provided health insurance, as well as reimbursement for out-of-pocket expenses. Nawara claimed that Frank had "unilaterally removed her" from coverage and left her without insurance for several months. Third, Nawara sought an order freezing the proceeds from Unit B's sale to preserve what Nawara believed to be marital assets. In support of her motion, Nawara attached, among other exhibits, an affidavit attesting to her current financial status and her employment history, as well as an email from Frank confirming that he had removed Nawara from his healthcare plan.

¶ 22    Frank filed a response and counter-affidavit in support, which challenged the assertions contained in Nawara's affidavit. Frank pointed out that dissolution proceedings had begun over three years ago, and Nawara had failed to seek any support until now. He further argued Nawara's motion failed to show any change in circumstances that warranted financial support from him.

¶ 23    On May 23, 2019, a hearing was held on Nawara's motion. During the hearing, petitioner's counsel commented that he did not have an updated financial affidavit from Frank, with the most recent one being filed in 2016. Respondent's counsel attempted to have Frank testify as to his current financial status, which the court denied because the temporary proceeding was "summary in nature and argument only," absent a finding of good cause. The court further noted that, under the Act and local court rules, Frank should have already supplemented his previous financial

affidavit. The court further stated that more recent income information was required from both parties. The court then assessed the couple's assets, and the following exchange occurred:

"THE COURT: Who is collecting the rents on these rental properties?

[Respondent's counsel]: I'm sorry. What rental properties, your Honor?

THE COURT: I don't know. There's a variety of properties---

[Petitioner's counsel]: There is a rental property in the John Hancock building. [Frank] is collecting that rent I presume. The properties in Syria are vacant. I don't know about the property in Jordan. That is also controlled by [Frank].

THE COURT: What about the property on Lakeview?

[Petitioner's counsel]: That's [Frank's] residence as I understand it.

THE COURT: I only have real control over the property here in the States.

[Petitioner's counsel]: Correct.

THE COURT: So who is residing in 175 East Delaware Place?

[Respondent's counsel]: It's empty, your Honor. It's not rented.

THE COURT: Why?

[Respondent's counsel]: The landlord chooses not to rent it.

THE COURT: Who is the landlord?

[Frank]: I am.

THE COURT: Okay. Well, that's called dissipation in my world. This is a marital asset. Why is it not accumulating rental income?

[Respondent's counsel]: Judge, it's not a marital asset.

THE COURT: Then why is it listed on her financial affidavit? Why is it not a marital asset?

[Petitioner's counsel]: It was acquired during the marriage---

THE COURT: Well, then it's presumed to be a marital asset, counsel.

[Respondent's counsel]: It's presumed to be.

THE COURT: Exactly. *** However, if something was purchased during the marriage, it is presumed to be a marital asset. It is then your burden to show me that it's not. *** If it's just in your name, it doesn't mean it's yours. It doesn't work that way.

*** *** ***

[Respondent's counsel]: Judge, if I may, on the matter of this unoccupied property in the Hancock, this has been something that---

THE COURT: Then I guess it needs to be sold. Then maybe it should just be sold. *** But a piece of property being vacant, being maintained, assessments paid in the Hancock building---I don't know if there is a mortgage on it or not; if there is, I don't know how the marriage is being paid—[it's] dissipation.

*** *** ***

[Respondent's counsel]: Judge, if I may, just regarding the property in the Hancock, we have proved to petitioner conclusive evidence that that property is nonmarital.

*** *** ***

THE COURT: Stop. You don't get to decide if that's nonmarital or not. I do. [Further text omitted].

[Respondent's counsel]: I agree. I should have brought motions for partial summary judgment.

THE COURT: Okay. But you didn't. And you're set for trial in July."

¶ 24    Following that exchange, the court issued the following oral ruling on Nawara's motion:

"THE COURT: So based on the limited information I have from the respondent, the information that I have from the petitioner, the arguments by counsel, the financial affidavits, and the verified pleadings, the [c]ourt has imputed income of $25,000 to the petitioner, $110,840 is what is set forth in the respondent's financial affidavit. Temporary maintenance shall be paid from the respondent to the petitioner in the amount of $2,355 per month commencing June 1st. The issue of retroactivity to the date of filing is reserved to trial."

¶ 25    The court also ordered Frank to immediately reinstate Nawara to his health plan. On May 23, 2019, the court memorialized its oral ruling through the entry of an "Initial Uniform Order for Support" for maintenance. Therein, Frank's salary was listed as $110,840 per year pursuant to his 2016 financial affidavit, and Nawara's income was imputed to $25,000. Frank was ordered to pay Nawara monthly maintenance payments of $2,355 beginning June 1, 2019, with the "issue of retroactive maintenance [to be] reserved."

¶ 26    On May 31, 2019, Frank filed a motion to modify the temporary maintenance order on the basis that his current gross income was $107,859, not $110,840, as delineated within the order. As such, Frank sought to modify his monthly payment to $2,280. In support of his motion, Frank attached his own affidavit, his 2018 W-2, and his 2018 federal income tax return.[5]

---

[5]It does not appear that this motion was ruled upon prior to the start of trial proceedings.

¶ 27                                c. Nawara's Notice of Claim for Dissipation of Assets

¶ 28    On July 5, 2019, three days before trial, Nawara filed a "Notice of Claim of Dissipation of Assets." Therein, Nawara asserted that both parties had been deposed on June 26, 2019, and that various marital properties had been dissipated during dissolution proceedings, specifically: (a) Unit A, following a withdrawal of equity in the amount of $190,000 in 2010; (b) lost income from failure to rent the Delaware property between September 1, 2015 to the present date at a rate of at least $1,450 per month; (c) marital funds used to purchase the Delaware and Lakeview properties, with an "amount currently under investigation"; (d) health insurance costs of $20,314.51 incurred by Nawara after Frank removed her from his healthcare plan; and (e) "intentional reduction of income" between the years 2006 through 2018 as evidenced by Frank's tax returns.

¶ 29                                          3. Trial

¶ 30    On July 8, 2019, nearly four years[6] after the filing of Nawara's petition, a four-day trial began.[7] Nawara called herself and Frank as witnesses for her case-in-chief, and Frank called himself as a rebuttal witness.[8]

¶ 31                                          a. Frank[9]

_____

[6]On September 3, 2019, Frank filed a motion to continue the ongoing trial proceedings due to a planned personal vacation. The trial court denied the motion on September 13, 2019.

[7]On the first day of trial, the parties discussed various pending motions before the court. On July 8, 2019, Nawara filed a motion *in limine* to limit any evidence at trial concerning assets held by the parties outside of the United States. The court orally denied this motion. Other motions included Frank's motion to modify temporary maintenance, various motions for sanctions, and Frank's apparent motion for partial summary judgment concerning the Delaware and Lakeview properties as nonmarital properties. The motion for partial summary judgment does not appear in the record.

[8]Although not expressly identified in the transcript, Frank appears to have been called as an adverse witness by petitioner's counsel. We note that there are multiple instances throughout the trial transcript where an incorrect name was attributed to a particular speaker.

[9]Although Nawara was called first, we have chosen to place Frank's testimony first as his extensive testimony provides more context to the parties' marriage, their financial status, and the marital estate overall. His adverse direct examination is first, followed by Nawara's direct examination, and ends with Frank's rebuttal testimony. We have attempted to cull through both parties' extensive testimony to eliminate

¶ 32    On direct examination,[10] Frank testified as follows. He had been born in Jordan, graduated from high school there, and completed a bachelor's of science degree in civil engineering at the University of Latakia. He immigrated to the United States for graduate school at the University of Texas, where he completed two masters degrees in or around 1989 in computer science and civil engineering. Following graduation, he worked at a company in Huntsville, Alabama called Integraph, which specialized in computer systems. Frank became an American citizen in 1990 or 1991, and then moved to Charlotte, North Carolina, where he began working for Kodak until 1992. There, he was responsible for inspection of electronic computer chips. During this time period, he made frequent trips back to Jordan, and met Nawara there in the early 1990's.

¶ 33    Next, Frank moved to Los Angeles, California, where he worked at ESRI, a company which specialized in "geographic information system software." Frank's annual salary ranged approximately between $60,000 and $70,000. While employed there, he and Nawara married in Las Vegas, Nevada, and registered their marriage in both Syria and Jordan.

¶ 34    In 1998, Frank left ESRI and moved to Chicago to take a job with a company called Accenture, where he served as a technical manager. He worked there for two years and made between $100,000 and $115,000 annually. He left Accenture at the end of 2000. Thereafter, Frank became employed by Sibel, a company which he described as a "customer relationship management system." Frank earned around the same salary he did at Accenture. Sibel was then acquired by a company called Oracle, which he began to work for following the transition. He

---

redundancies, and are mindful of the parties' respective burdens during dissolution proceedings, which shall be delineated within our discussion of the issues on appeal.

performed the same duties there as he had for Sibel, in addition to managing Oracle's own software. His salary at Oracle has remained the same for "many years."

¶ 35 Frank was questioned about the parties' real property assets. After he and Nawara moved to Chicago, they purchased a townhouse in Evanston, located at 918 Hinman Avenue, Unit A.[11] Unit A's title was in both their names, although Nawara's name had been "handwritten" into the deed. Unit A had been encumbered by a ten-year mortgage of about $220,000, but Frank received an inheritance from his father and used some of it to pay off the mortgage. Unit A was refinanced at $199,000 in 2002, in 2005 at $173,000, and again in March 2010, when the couple decided to buy the unit next door, specifically 918 Hinman Avenue, Unit B, for "their daughters' benefits."

¶ 36 To purchase Unit B, Frank took out a 30-year home equity loan against Unit A in the amount of $296,250. Frank explained that he wanted Unit A to be a "tax shelter." Unit B could not be financed normally because "mortgage companies w[ould] not give you a mortgage on a property in a building that you own more than 5 percent of," and the townhome in which he and Nawara resided consisted of five units, each representing twenty percent interest. When asked if he had saved more money in taxes than what he paid in interest for this endeavor, Frank testified that he could "claim the interest on Unit A as part of the mortgage so it will not be taken out of [his] taxes" and "out of [his] gross income[.]"

¶ 37 Frank testified that Unit B's title had been issued to "Frank Ennab, a single person." When asked if he had been a "single person" at the time of purchase, Frank responded that he had been married to Nawara, but took title without her because it "was agreed that [he] would only have [his] name on it." When asked whether being listed as a "single person" was a false statement,

---

[11]Per the parties' stipulation, Unit A's property value was estimated to be worth $390,000 at the time of trial.

Frank responded: "I'm not sure what single person means to you, but it doesn't mean that I'm not married." Frank explained that, over the years, the couple "had issues" when Nawara travelled, as she would spend three months in Syria every year, and Frank could not refinance their properties without her signature. As such, the two agreed that Unit B's title would only be in his name to make it "eas[ier] to do any transactions without her being present or giving [him] a power of attorney." Frank acknowledged that this agreement had not been memorialized in writing. Frank's counsel who prepared Unit B's deed was his current counsel at trial, and he had known that Frank had been married to Nawara at the time.

¶ 38    Frank testified that Unit B was subsequently rented out to one family, but he decided to sell it when he determined that it was not generating income based on its age and condition. Although the unit was listed for sale, Frank's real estate agent advised that the property would not sell until it was remodeled. As such, Frank removed the property from the market. He completed most of the repairs on the unit himself, but also brought in contractors for further repairs. After remodeling it, the unit was eventually sold, with the proceeds currently being held in an account in his name per court order. He did not make any profit from the unit.

¶ 39    Next, Frank purchased two condominiums in Chicago prior to the sale of Unit B, the first being the Delaware property.[12] The Delaware property was purchased with money he had received "back home," and it was encumbered by a $135,000 mortgage. When applying for the mortgage, he included assets in the United States and money from "wires back home." The outstanding balance was paid with "non-marital money" from one of his Chase bank accounts. The costs of maintaining the unit included: monthly mortgage payments; assessment fees; real estate taxes;

---

[12]The record shows that the Delaware property was transferred to Frank by trustee's deed on April 5, 2013, while the Lakeview property was acquired by warranty deed on January 23, 2014.

required building insurance fees; and a required building internet fee. He also paid a finder's fee commission to Baird & Warner for one month's rent after they acquired a tenant for him. He conducted minor repairs on the unit, such as painting, re-carpeting, and replacing the towel bar and shower curtain, and later testified that he replaced the air conditioning unit and microwave. He painted the unit himself. He did not recall the total costs of repair, but believed a friend helped out with some of them. The property had been in "bad shape," but he did not wish to remodel it because it was expensive to do so.

¶ 40    Frank leased the unit for $1,450 a month from September 1, 2014, to August 31, 2015, thus generating a total of about $17,400 of rental income. He had not leased or collected any income from it between then and September 2019, where he was now renting it for $1,500 a month. However, he later testified that he leased it until June or July 2016. His family also used it from time to time, specifically one of his daughters, who stayed in the unit for about six months after her college graduation in June 2016, as well as his Jordanian family whenever they visited Chicago. Frank paid the property's expenses with money from "back home" as well as rental income, and denied using any salary earnings to do so. He explained that the money from "back home" had come from a sale of a piece of land, which he later clarified as two pieces of land. He paid taxes in both the United States and Jordan on the proceeds from the land sale, which had been withheld on his paycheck.

¶ 41    Next, Frank purchased the one-bedroom Lakeview property, which was encumbered by a mortgage. In his loan application, he disclosed that his assets were estimated to be $1,139,938.07, but believed that the number to be inaccurate as it included his other mortgages. He closed on the property with $44,705.85, and further stated that his inheritance money had also been used to purchase the unit. The unit's expenses included: the mortgage; assessment fees; mortgage interest

fees; and insurance payments. Frank also leased the Lakeview property until June 30, 2015, at a rate of $1,800 a month, and then moved into the unit himself in September 2015. He did not make any improvements to the property other than painting. The Lakeview property's expenses were also paid out of proceeds from the land sale "back home" and rental income. Petitioner's counsel estimated that both properties' total expenses were around $320,000, with a potential discrepancy of about $167,000. Frank responded that he had been living in the Lakeview property and there were "associated expenses" for his accommodations. Petitioner's counsel asked if those remaining expenses had been paid by Frank's salary, to which he replied that "there were some expenses [he] supplemented" and that he had used "some of [his salary]" to do so.

¶ 42    Next, Frank was questioned about his salary at Oracle. He testified that he received a salary and bonus, with his "net income" somewhere between $75,000 and $80,000 a year. Frank explained that his W-2s reflected what Oracle called a "gross earning," which was distinguishable from a "gross income." Oracle calculated the cost of its healthcare plans into an employee's gross earnings and thus, his gross income was "exaggerated." Oracle also did this with their 401ks, where, if the company matched an employee's contributions, it would also add it to the employee's total earnings. The purpose of this calculation was to lower Oracle's tax liability.

¶ 43    Frank was shown copies of his W-2s from years 2006 through 2010, and confirmed that he had earned $106,000 in 2006; $133,988 in 2007; $124,034 in 2008; and $139,988 in 2009. For the year 2010, petitioner's counsel asked why his wages were listed at $19,991.93. Frank responded that the number "did not look accurate" as he had been employed full-time that year. With regard to his 2011 salary, listed at $165,444, Frank testified that he had held stock in Sibel prior to Oracle's acquisition of the company, which he "probably" sold that year. Once the stock was sold, the proceeds went to the "household income" and "household checking account." With regard to

his 2012 and 2014 salaries listed at $136,000 and $137,656, respectively, Frank confirmed the numbers, but stated they were not truly accurate based on his prior explanation. When asked why his salary in 2015 had decreased to $120,665, Frank was "unsure" but speculated that it was due to Oracle's accounting practices. With regard to his 2016 income, Frank confirmed that it was listed as $130,754, but that he had also received about $20,000 in non-salary benefits. With regard to his 2017 income, he confirmed that his salary decreased to $105,881, and speculated that Oracle had either changed its accounting practices or had distributed a smaller bonus that year.

¶ 44     Frank testified that he had received tax refunds for the years 2016 through 2018. Since 2014, he had filed his returns as both "head of household" and "singular." Petitioner's counsel directed him to his 2015 tax return, which listed an item characterized as a "bad debt loan." Frank testified that this was a $20,000 deduction for money he had loaned to his sister's husband, which had never been repaid. When asked from where the loan money had originated, Frank answered that he believed it had come from "overseas" but was unsure and did not remember.

¶ 45     Petitioner's counsel estimated Frank's net income between 2016 and 2019 to be about $491,000, and speculated that there was about $324,000 unaccounted for in his financial records. Frank responded that he "account[ed] for everything [he] spent," and that he needed to pay his own rent, that he ate out from time to time, and travelled and visited his family. He also paid his daughters' educational expenses. When asked whether his salary had been used to support Nawara after he moved out of Unit A in August 2015, Frank responded that he paid the mortgage, homeowner's insurance fees, and assessments for Unit A until a court order made Nawara responsible for such expenses. Frank had not used any money related to the Delaware and Lakeview properties to support Nawara from February 2016 onward, other than court-ordered health insurance and maintenance.

¶ 46    Frank was next asked about his life insurance policy. He testified that he had "protective life insurance," which was "life term" and would "disappear" if he died while no longer working at Oracle. When asked if the policy was worth $300,000, Frank responded that the policy's worth was based on a "percentage of income" where one could "pick one year" or two years of salary. He confirmed that Nawara was no longer his beneficiary, as he had changed the designation to both his daughters.

¶ 47    Frank was next asked about his bank accounts. He had opened various accounts in his daughters' names prior to them reaching 18 years old, which he funded from his Oracle earnings. Once his daughters turned eighteen years old, he asked them to move the money into their own accounts. His youngest daughter, Nadia, had most recently moved funds out of the account a few months prior, which he estimated to be between $26,000 and $30,000. Her money had been comprised of Nadia's various tutoring jobs and a bonus she received while working prior to graduation. She had also taken out a non-interest loan during college to help build her credit. Frank also admitted to funding the account. His daughter Dina had one savings and one checking account that had held a "couple thousand dollars" and had been funded from his salary. Dina had closed the savings account, but kept the checking account open with about $100 or $200 remaining.

¶ 48    Frank was then questioned about his removal of Nawara from his healthcare plan. He testified that he had informed her of the change via email to her and their daughters. He removed her because she had a full-time job at the time, and he had "received multiple threats from her that she was going to abuse the healthcare plan" and that she had "already [done] that" by seeing doctors outside of network. Frank paid the bills for such visits as she had refused to pay them. Frank acknowledged that he had recently reinstated her to the plan because the "court ordered [him] to," but if Nawara had informed him that she had lost her job and needed to be reinstated,

he would have done so. However, he did not learn of her job status until 2017 because Nawara never responded to his email and did not communicate to him that she was no longer working.

¶ 49    Upon cross-examination by his counsel, Frank testified that his projected retirement age was 66 years and 4 months, which was less than 3 years' time. With regard to health insurance, Frank considered his email to Nawara to be "fair notice and warning."

¶ 50    With regard to his inheritance, Frank testified that he had inherited agricultural lands and a few properties, which had been divided amongst him and his five siblings over the course of several years.[13] He also inherited some shares of a house and other properties in Syria, and "made a deal" with his siblings to increase his share. Frank would then from time to time authorize one of his brothers to sell various parcels and send the money back to the United States. He also sold some of his interests to the French embassy. With some of the proceeds, he bought a condominium unit in Amman, Jordan from one of his brothers, who was an architect and had constructed the building. He had not used any money from his salary at Oracle or from the marital estate to purchase that property. Frank also purchased other properties in Syria with the remaining proceeds, which included a studio for $60,000, which he spent about $120,000 renovating. This property was listed in Nawara's name because as a non-Syrian, it would take time for him to transfer the property due to various "security checks." The purchase occurred during a summer when Nawara and their daughters had visited Syria. Frank denied that the property was a gift to Nawara, and that it was his intention to use the home as a "center for himself and his family" when they visited the

---

[13]During multiple instances at trial, respondent's counsel attempted to introduce evidence of various international properties either owned by Frank, Nawara, or both, which was objected to consistently by petitioner's counsel. The court sustained virtually all objections on the basis of, among others, the hearsay and failure to properly authenticate. Frank listed a variety of international properties and their associated addresses in his closing arguments, but the trial transcript is unclear as to which properties he is referring to at a given time during his testimony.

country. Frank also owned a commercial property in Damascus that was purchased with marital money in 2012, in which he and Nawara held a fifty percent interest in, with Nawara's sister owning the remaining fifty.

¶ 51    Frank was further questioned about the purchase of Unit B, which he stated he had bought with land sale proceeds from Jordan and his salary. Neither Nawara nor his daughters had contributed to the closing. The down payment had been paid through a joint checking account to which neither Nawara nor his daughters contributed. Unit B was resold in 2016 with net proceeds estimated at $350,000, which he placed into a separate Chase savings account. There was about $107,000 remaining in the account. Nawara had authorized Frank to be her power of attorney for the home equity loan used to purchase Unit B, and he had signed the refinancing documents on her behalf. $155,000 of the loan was used to purchase Unit B, and the remaining balance of $150,000 came from the couple's joint checking account.

¶ 52    Upon recross examination by petitioner's counsel,[14] Frank testified as follows. With regard to the couple's agreement to buy Unit B with a home equity loan, Frank maintained that Nawara had agreed to the course of action "without him convincing her" because the money borrowed would be paid "in the future back to the marriage." The two also agreed to place Unit B in his name as a "single person" so that he owned it as a non-marital unit. He denied that he intended to buy a property that she would have no interest in, but acknowledged that their agreement was not

---

[14]During recross examination, petitioner's counsel asked Frank if he had spoken to his lawyer regarding his previous testimony in the case, and Frank responded that he had. Petitioner's counsel asked what they discussed, and respondent's counsel objected on the basis of attorney-client privilege. The trial court overruled the objection, stating that, "You don't get to assert the privilege, it's the client who does." We raise this exchange briefly in order to provide context for one of Frank's requests on appeal, which was imbedded within a footnote on the last page of his brief.

in writing and that Nawara had not been represented by an attorney during these discussions. Frank agreed that he was not a "single person" at the time of acquisition.

¶ 53    With regard to his real estate in Syria, Frank testified that he sold various parcels and used the proceeds to buy property in Jordan. He did not declare the income from the sale on his tax returns because it was an inheritance.[15] Frank confirmed that such property had been purchased while married to Nawara, but was unsure of its cost because Nawara paid for it using from funds from when she had previously "worked in Damascus." There was no written agreement between the two of them as to this property, but Nawara was an owner.

¶ 54    Frank was directed back to his tax returns. Frank testified that in 2016 and 2017, he took a deduction for a vacation home, which was a studio in Delaware.[16] Frank had reported a capital gain in the amount of $45,000 when Unit B was sold. He also claimed a $6,000 childcare credit in 2018, which he believed to be a college-related expense for his youngest daughter.

¶ 55    On recross examination by his own counsel, Frank reiterated his belief that his designation as a "single person" on Unit B's deed did not speak to his marital status, but only who served as titleholder.

¶ 56                                    b. Nawara

¶ 57    On direct examination by her own counsel, Nawara testified as follows. She had lived in Illinois for 20 years and currently resided in Evanston in Unit A. She became pregnant four months after she and Frank married. Their marriage broke down "in one day" when, in 2007 or 2008,

---

[15]Petitioner's counsel attempted to impeach Frank with his deposition transcript, where he apparently said that he had paid an inheritance tax. The record also reflects that Frank appears to have stated on direct adverse examination that he had paid an inheritance tax on property inherited in Jordan.

[16]This property never appeared to be addressed by the parties throughout the proceedings.

Frank became "irritated" with her and asked her to leave the house. They attempted to reconcile in 2008, but were not successful. She had not seen or spoken with Frank in five years.

¶ 58 Nawara was born in Damascus, and her native language was Arabic, with her second language being French. She had taken two English classes for about eight weeks in Damascus before immigrating to the United States in 1993 at the age of twenty-five, and any additional English she learned came from living in the United States, working, watching television, or with friends. While in Syria, Nawara received an equivalent of a high school education and completed a bachelor's degree in pharmacy from the University of Damascus, which was a five-year program in pharmacy and chemical pharmacy. She had not been formally employed in Syria, but did unpaid "practical work" in a pharmacy. After graduation, she worked for two years as a volunteer in a suburban village outside of Damascus.

¶ 59 Nawara was unemployed when she came to the United States, as her Syrian pharmacist degree was insufficient to become a licensed registered pharmacist in Illinois. Thus, she took the requisite equivalency and board exams in Illinois, which were a series of five exams that took three years to complete. She was also required to do a 400-hour unpaid internship. She became fully licensed in 2008.

¶ 60 Nawara's first paying job was in 2012 at a small private pharmacy called J Discount Pharmacy, which was initially located in Evanston and then relocated to southern Chicago, near Indiana. Her initial role was staff pharmacist, and over time she became the "pharmacist in charge." Her duties included dispensing medications and consulting with patients, talking to doctors, and taking prescriptions over the phone. When the pharmacy moved locations, she continued to work there. In 2016, the pharmacy closed and she became unemployed. Throughout 2017, she would work "as needed" at various pharmacies, but they were not regular jobs and she would often only

be contacted once a month or every twenty days to work. She had not tried applying to chains such as Walgreens and other larger pharmacies at the time, though nothing had prohibited her from doing so. She was unable to work at stores such as Walgreens or CVS as a pharmacy technician. She explained that because she had a higher degree, her technician license had been superseded and further believed that pharmacy technicians were paid minimum wage. Nawara had applied to more than 100 jobs over the course of her job search. She utilized Linkedin and applied to jobs up to forty hours a week. She did not have a record of her efforts, as she was not always able or allowed to print out her final submission given that most applications were now online.

¶ 61    Nawara was questioned about her assets, beginning with her bank accounts. She had a checking and savings account with Bank of America, which held $31,000 and $6,000, respectively. Some of the funds therein included maintenance payments from Frank. Her mother had also given her a cash money gift two or three years ago while Nawara had been overseas. Nawara brought the cash to the airport, declared it, and deposited it into the bank upon arrival in the United States. Nawara also received a money gift from her godfather in the amount of $100,000 about two years ago, which she also deposited into the same bank account via a wire transfer. The two gifts were being used for living expenses.

¶ 62    Nawara did not have any debt, but did not have any income and had not been required to file a tax return in 2018 or 2019. Other than maintenance payments, she had never received any money from Frank, even while still living together, and he had not provided her with any money for household expenses for at least six or seven years. She acknowledged that he might have put around $400 or $500 in an account at the beginning of every month while still living together, but ultimately she had to use her earnings from her pharmacy job for household expenses. Frank also

had not provided her with any support between December 2016 and when court-ordered maintenance payments began.

¶ 63      With regard to her real property assets, Nawara denied acquiring any property in Syria or paying any expenses related to any such properties. She denied receiving income from Syria, and denied ever seeing any document that gave her ownership or control over any property in Syria.

¶ 64      On cross-examination by respondent's counsel, Nawara testified as follows. In Syria, she became licensed as a pharmacist in 1989. She denied working for a Syrian pharmaceutical company called "Tal-Laaj & Company" between 1993 and 2002, indicating that she did not work until after graduation and had moved to the United States during that time period. She denied showing Frank her "company offices" while in Syria, or introducing him to any of her co-workers.

¶ 65      With the exception of temporary or ad hoc part time employment, Nawara had been unemployed from the end of 2016 to February 28, 2020. She did not have any documentation related to her termination from J Discount. She had not filed for unemployment insurance when she was terminated, as she did not know if she was eligible for it and was also looking for a job at the time. When asked if her reported income at J Discount between 2012 and 2017 was $192,404, Nawara responded that she did not know. Her salary had gone to household expenses such as the mortgage, utilities, or the children's education, as well as the mortgage in February 2016.

¶ 66      Nawara was referred back to her testimony regarding the difference in licensure between a pharmacy technician and a pharmacist. Her technician license had been removed in 2008 after she became licensed as a pharmacist. She did not know if she could reinstate her technician license, but was not implying that she could not reinstate it simply because she was also licensed as a pharmacist. Nawara estimated a pharmacist salary to be about $40 an hour, or in Chicago, between $70,000 and $100,000. Nawara had documented her work search efforts to the best of her ability.

Before retaining her current attorney in 2019, she did not keep a record of her job applications. She had also applied for jobs where she did not receive acknowledgement of her application by letter or email.

¶ 67    Nawara was shown various exhibits documenting her job search efforts, and confirmed that she had applied to a variety of companies, such as Presence Health, North Shore University Healthcare, and multiple jobs at Walgreens. She acknowledged that, although she had provided various documents showing that recruiters on Linkedin had viewed her profile, this did not mean that she had submitted an application for those positions. When asked if she had only applied to two jobs in 2016, Nawara indicated she had still been employed at J Discount for most of 2016, but otherwise had applied "every day." When asked if she had applied to only one job in 2017, she stated that she had held a part-time job that year. She did not remember if she had applied to 17 employers within the first three months of 2019. Nawara intended to become employed because she needed to be "independent," and that she "love[d] what [she did]."

¶ 68    Nawara was directed to her bank statements. In October 2012, she had received a money gift via wire transfer in the amount of $9,965 from a "Mr. Masoud," who was her godfather. He had also gifted her additional funds from him in December 2012 in the amount of $19,968, and another on August 16, 2018. Nawara was shown a copy of two certificates of deposit from Bank of America, which showed $30,000 from the same individual. She was unsure of what those amounts were. Nawara further confirmed a wire transfer from her father in November 2005 in the amount of $99,985. With regard to the $45,000 gift she received from her mother, Nawara testified that she received the money in U.S. currency in 2017 and declared it at an airport kiosk. Nawara denied receiving a receipt or certificate after declaring the money. She denied filing any registration documents at the airport and instead verbally spoke to a customs officer, who input

her information into a computer system. After she left the airport, Nawara went to a bank and deposited the money. She denied being informed that the bank was required by law to file a currency transaction report for a cash deposit of that size.

¶ 69    Nawara was directed to her 2019 financial affidavit. She had truthfully claimed that her daughters were living with her in 2019. Nawara's stated cost of living included her mortgage payments, but was not inclusive of food, clothing costs, or taxes. When asked if she was "hiding any money," she responded, "where would I hide money?" Respondent's counsel pointed out that Nawara had listed three properties in Syria under her name. Nawara stated that she only owned one non-marital property in Damascus, which had been a gift from her father. However, she had not fully acquired this property because it had to be divided between herself and her siblings, and that due to the "difficult political situation" in Syria, the government was "closed" and her family was unable to file the requisite paperwork to do so. She further testified that Frank had bought the studio in Damascus, and that she only had ownership of one property in Illinois. Respondent's counsel pointed out that Nawara's 2016 financial affidavit had not listed any properties in Damascus, and Nawara answered that she believed she only had to list stocks and pensions, not real property. She further stated that she had only listed marital properties, and her Syrian property was not marital in nature. Frank's Damascus studio had been given to her in 1999 and placed in her name. However, she had no documentation to show this.

¶ 70    On redirect examination by petitioner's counsel, Nawara testified as follows. It was her understanding that she was not eligible for a pharmacist technician's license, but if an individual wanted to be certified as a technician, it may require additional testing. Nawara further denied being employed in Syria during her marriage. At the time she had been discharged from J Discount, she had been unaware of the Illinois Unemployment Insurance Act, and did not recall the pharmacy

posting any signs, notices, or literature informing her of her rights. Frank had never discussed with her how to obtain unemployment insurance or that she was eligible for it. Nawara reiterated that although her documentation of her job search activities improved once she retained counsel, her job search efforts had not changed, with the exception of her spending more time on Linkedin. From the time she lost her job through February 2019, she spent at least five hours a day applying for jobs. She also worked with some recruiters, which had not been successful. She did not have any other bank accounts besides those at Bank of America. When she received a wire transfer from her father in 2005, the transfer went into a joint bank account she shared with Frank, of which he was aware.

¶ 71    On recross examination by respondent's counsel, Nawara testified that she did not apply for a pharmacist technician license prior to becoming licensed in Illinois, and that her current knowledge about the technician license was based on her discussions with others.

¶ 72                                C. Frank's Rebuttal

¶ 73    On direct examination, Frank testified as follows. He was currently employed as a project manager at Oracle, and worked with companies such as Pfizer, Baxter, Merck, and Johnson & Johnson. His salary had been the family's sole income since the parties' marriage. In the early 1990's, his income had been sufficient to cover family expenses, but recently it was "barely enough" and thus he had to supplement it. He had not received a raise at work given the level of competition in his field, and he expected his salary to remain the same with the exception of a bonus component that would fluctuate from year to year.

¶ 74    He and Nawara had a good relationship and family life until 2008 or 2009, more specifically around September 15, 2009. Frank attributed the deterioration of their relationship to

his desire of wanting her to work and contribute to the family. In mid-January 2008[17], Nawara and Frank had a conversation in his office where she informed him that she had passed her exams and was officially licensed. However, she wanted to take a break from her three-year study period, and wished to go to Syria for the summer and look for employment when she returned. In August 2009, Nawara returned from Syria and Frank approached her about finding a job. In mid-September 2009, Nawara told him that she had discussed the possibility of her employment with her family, and decided that she was not going to work because she "was the woman" and the "woman does not contribute to the family." According to Frank, Nawara stated that it was a "man's job and responsibility to do that" and that she felt that she had no responsibility to work. Frank described this interaction as "significant."

¶ 75    In December 2012, Nawara and Frank had another conversation in his home office to discuss a job offer she received from J Discount, which she planned to start the next week. Frank believed that the job was "below her skill level," and told her that he had hoped that she would find a job with a bigger company. Nawara stated to him that "you're telling me to find a job all the time" and "I found a job just to show you that I can find [one] whenever I intend to." Frank told her that he was glad she had changed her mind about working, to which she responded that she had not. She stated that her salary would not be contributed to the family income and that she and their two daughters were his responsibility. She reiterated that the "woman [did] not contribute to the family," that it was a "man's job," and asked him "are you a man?" To his knowledge, Nawara had not contributed any of her salary to the household expenses, such as groceries or the mortgage, and did not buy her tickets for her yearly summer trip to Syria. Although his relationship was

---

[17]Frank's testimony was that this conversation occurred in January 2008, however, he further testified that she had studied for her licensure between 2005 and 2008.

Nawara was affecting his mental health at that time, he did not move out of the house until both their daughters were at college.

¶ 76    Frank was questioned about the state of his finances and other assets. With regard to his bank accounts, he currently had $40,000 in his Chase accounts, which were separate from the account that held the remaining funds from the sale of Unit B. He also had around $8,000 in a separate Citibank account. He had never sent any money outside of the United States, with the exception of wire transfers to family outside of the country. He would also send money to Nawara from time to time when she travelled with their daughters during the summer.

¶ 77    With regard to the home equity loan used to purchase Unit B, Frank testified that he took out the loan for two reasons. First, he wanted a tax shelter because he had "made a mistake by paying the mortgage [on Unit A]." Second, he wanted extra money to supplement the funds they would use to purchase Unit B. With regard to the Delaware and Lakeview properties, Frank used $153,000 of his inheritance to finance both, specifically using $47,000 for the Delaware property's down payment. He had bought the Lakeview property because the Delaware condominium had not been large enough for him. He also wanted to get his remaining money out of Jordan and invest it within the United States.

¶ 78    Upon cross-examination, Frank testified as follows. When asked why he had listed himself as a "single person" on the title for Unit B, Frank responded that it had been "more convenient" for him to pay taxes without needing Nawara's power of attorney. He reiterated that the purpose of the home equity loan was to create a tax shelter and reduce his overall tax liability. When asked how this strategy benefitted his family, Frank responded that it reduced his gross taxable income by the interest he paid. Frank testified that he took a deduction in 2014 and 2015 for the home

equity loan as "head of household," not as a "single person," but stopped doing so after because Nawara began paying the loan.

¶ 79    On redirect examination, Frank testified that he and Nawara had agreed in March 2010 to omit her name from Unit B's purchase agreement, as the unit would likely require a lot of attention and they would possibly need to refinance in the future. On recross examination, Frank testified that he wanted Unit B in his name so he could "take action" without Nawara's signature, although he "always consulted" and "took her opinion" for "any decision." When asked if "it was entirely within [his] power and discretion as to whether Nawara would have any input on the future of Unit B," Frank responded, "legally speaking, yes."

¶ 80                                    4. Closing Arguments[18]

¶ 81    The parties submitted written closing arguments. Relevant here, Nawara argued that Frank had dissipated marital assets with regard to his handling of the Lakeview and Delaware properties, estimating that about $324,366.98 had "disappeared." Next, Nawara sought reimbursement for the costs of her health insurance premiums in the amount of $20,314. Nawara also sought retroactive maintenance "from the beginning of the case," which was estimated to be $122,642. Finally, she urged the court to order Frank to "maintain $300,000 in life insurance on his life with Nawara as the beneficiary" and their daughters as contingent beneficiaries. In Frank's closing argument, although he argued that Nawara should not be entitled to further maintenance, he did not appear

---

[18]During trial, the court entered various exhibits into the record, including: deeds to the relevant properties; leases for the Delaware and Lakeview properties; Frank's records pertaining to his health insurance and various retirement accounts; Frank's income and bank account statements; Frank's 2016 financial disclosure; Frank's tax returns between 2013 and 2018; Nawara's income tax returns for years 2014 through 2016; Nawara's financial affidavits from 2016 and 2019; Nawara's resume and documented job efforts; Nawara's bank accounts; and the parties' joint tax returns.

to challenge her request for retroactive maintenance therein. Frank also contended that Nawara's dissipation notice had not been timely filed in order to claim dissipation.

¶ 82                        5. Judgment for Dissolution

¶ 83    On December 7, 2020, the trial court entered a dissolution judgment.[19] Preliminarily, the court found that the evidence at trial had established grounds for irreconcilable difficulties and that all future attempts at reconciliation would be impractical. Thus, the dissolution judgment was focused on the "determination and definition of marital property, maintenance, distribution of the marital estate, allocation of marital debt, and attorney[] fees[.]"[20]

¶ 84    Next, the court determined the couple's marital assets pursuant to the twelve factors delineated within section 503(d) of the Act.[21] The court further stated that it would "review the remaining factors for purposes of both its consideration of the equitable division of the marital estate[,]" as well as its "determination of whether Nawara [was] entitled to receive maintenance from Frank" pursuant to section 504. With regard to marital property, Frank was awarded the Delaware and Lakeview properties. Nawara was awarded Unit A, subject to the mortgage, with various contingencies in place to attempt to release Frank from the mortgage.

¶ 85    Frank was also ordered to maintain $300,000 in life insurance proceeds on his life insurance policy with Nawara as his primary beneficiary, and Dina and Nadia as contingent

---

[19]The dissolution judgment was later corrected by order of March 4, 2021, which clarified various typographical errors in the original judgment.

[20]The court also noted that "the issue of potential ownership by the parties of properties in the Middle East arose during this case," but that it was "not able to dispose of any overseas properties[.]." Accordingly, the court "decline[d] to exercise jurisdiction regarding any foreign real estate or other assets outside of the United States[,] and ma[de] no ruling regarding any such assets."

[21]The specific findings of the court as to these factors are delineated in detail in our discussion of the relevant issues. As will be discussed later, section 503 of the Act (governing marital property distribution) and section 504 (governing maintenance provisions) utilize statutorily-required factor tests. However, many of the factors overlap. See 750 ILCS 5/503, 5/504 (West 2016).

beneficiaries.[22] Nawara was awarded "all disclosed financial accounts in her name." Frank was

rewarded the same, with the exception of the account holding the proceeds for the sale of Unit B,

which was awarded to Nawara.

¶ 86    With regard to health insurance, the court made the following findings:

>    "[D]. HEALTH INSURANCE
>
>    This [c]ourt notes that on May 23, 2019, as a condition of its Temporary
>    Maintenance Order, this [c]ourt ordered Frank to restore Nawara to insurance
>    through his employment, Frank having improperly and with no legal right or
>    justification, on or about February 27, 2015, removed Nawara from his insurance.
>    [Citations omitted.] This [c]ourt accordingly orders Frank to pay to Nawara
>    $20,314 out of his share of the marital estate to compensate Nawara for her out-of-
>    pocket private health insurance premium payments."

¶ 87    The court also made findings regarding the dissipation of marital assets. First, in a footnote,

the court stated:

>    "[T]his [c]ourt heard on May 23, 2019, that Frank had not been renting the
>    Delaware property; this property was not generating income and, therefore, this [c]ourt
>    considered this to be dissipation. It was dissipation of a marital asset in particular because
>    Frank purchased this property during his marriage to Nawara; the property was therefore
>    presumed to be marital. [Citation to May 23, 2019 in-court hearing transcript.] This [c]ourt
>    finds that Frank has not presented any evidence to rebut this presumption as to this or any

---

[22]Frank's life insurance policy also does not appear to be listed as an asset within the court's recitation of the marital estate.

other real property and, therefore, deems all four of the real properties specified above to

be marital."

The court's dissipation finding was further reiterated in its discussion regarding the division of the

marital estate pursuant to section 503(d)(2), where it ordered Frank to pay Nawara $35,525 for the

dissipation of assets related to the Delaware property.

¶ 88    Finally, the court found that "Nawara [was] a candidate for continuing maintenance"

pursuant to section 504(a) of the Act.[23] The court found that Nawara was entitled to retroactive

maintenance from October 2015 to May 2019 based on the temporary maintenance amount of

$2,355 per month, for a total of $101,265, but noted that Frank had paid maintenance for June,

July, and August of 2019. The court also ordered Nawara's temporary maintenance payments to

remain in effect through October 2020, with Frank to pay Nawara a new obligation of $3,355 per

month for 26 years and 10 months.

¶ 89                              6. Motion to Reconsider

¶ 90    On January 5, 2021, Frank timely filed a "Motion to Reconsider, Vacate or Modify Portions

of Judgment for Dissolution of Marriage and for Clarification of other Portions." First, Frank

sought reconsideration of the court's ruling on his retroactive maintenance obligation, arguing that

the award was inappropriate for the months that Nawara had worked as a full-time pharmacist

between 2012 through December 2016. Additionally, Frank observed that Nawara filed her

petition in 2015 and made no effort to apply for temporary maintenance until 2019, although he

acknowledged that this was likely because she had been employed during that time. In the event

that the court still found retroactive maintenance to be appropriate, Frank proposed that it be

---

[23]The trial court's order further stated "In this matter, calculation of maintenance would yield as follows[.]" However, there was no such calculation following this statement.

limited in time from January 2017 through May 2019, with deductions made based on the part-time work Nawara had throughout that time period.

¶ 91    Second, Frank challenged the court's implicit finding of a $0 income imputation to Nawara in its determination of Frank's maintenance obligations. Frank argued that this finding suggested that Nawara would never be able to find employment, despite her education and experience as a pharmacist. Third, Frank argued that the court's dissipation finding was also in error. Frank observed that discovery in the case had closed on May 31, 2019, and Nawara had filed her Notice of Claim of Dissipation on July 5, 2019, three days before trial. Without citing the relevant statute governing dissipation notice requirements, Frank argued that the notice was not timely filed, and that he had raised this issue during the course of trial as well as in his closing argument.[24]

¶ 92    Nawara filed a response. First, she argued that the court had properly determined Frank's maintenance obligations by imputing her income to $0 based on her prior employment history and unsuccessful efforts to find employment. Second, Nawara contended that retroactive maintenance was proper under section 504, as the statute was not limited to temporary maintenance relief, and the evidence showed that Frank had not contributed to the marital estate. Third, Nawara argued that any objection to her dissipation notice was waived. Nawara further agreed that discovery had closed on May 31, 2019, but that the parties had agreed to extend discovery pursuant to Illinois Supreme Court Rule 201(i), as shown through an email exchange dated May 31, 2019, thus making her notice timely under the statute.

---

[24]The page number that Frank identified as him raising the issue of untimeliness was a general citation to the provision of the Act governing dissipation, specifically 750 ILCS 5/503(d)(2)(i), but it did not contain any argument as to the notice being untimely.

¶ 93    Frank filed a reply, wherein he argued, for the first time, that Nawara's receipt of $145,000 from her family should have also been considered in the court's calculation of his maintenance obligations.

¶ 94    A hearing on the motion was held on May 11, 2021, and the court took the matter under advisement. On August 18, 2021, the court granted in part and denied in part Frank's motion. First, the court rejected Frank's contention that it had failed to consider the $145,000 gift to Nawara when calculating the parties' income and Frank's maintenance obligation. The court determined that the $145,000 was distinguishable from the money gifts discussed in *In re Marriage of Ruvola*, 2017 IL App (2d) 160737. Specifically, the court found that the money was not "a regular monthly gift," as such funds had been issued separately and on a one-time basis in 2017 and 2018. However, with regard to Nawara's $0 income imputation, the court agreed with Frank that it had previously imputed $25,000 to Nawara during the temporary maintenance hearing. As such, the court proceeded to recalculate maintenance with the $25,000 income.[25]

¶ 95    Next, the court reiterated that Nawara was a candidate for maintenance, but given the new income imputation, it needed to re-calculate Frank's maintenance obligations. The court determined Frank's income to be $96,693.66 based on an average of his incomes for 2016, 2017, and 2018, noting that Illinois law allowed for the averaging of fluctuating incomes so long as there was no dispute in the income data's reliability. The court also found no evidence of Frank's need to pay child support for the marriage or any past relationships, and that the parties' combined total income was below the statutory cap of $500,000. After further calculations pursuant to section (b-

---

[25]We again reiterate that the trial court's original dissolution judgment did not expressly calculate the amount or duration of maintenance in accordance with section 504's statutory maintenance guidelines. See 750 ILCS 5/504(b-1), (b-2) (West 2018). Thus, there had been no such "calculation" in the original order, and the court's calculation in its order addressing the motion to reconsider is the first time it appears in the record.

1)(1)(A) of the statute, where the court had to make adjustments to the maintenance calculation based on other statutory caps, the court determined that Frank's monthly maintenance obligation was now $1,973.12, to begin December 1, 2020. The court further determined that, pursuant to section 504(b-1)(1)(B), Nawara's maintenance award would last for 26 years and 10 months, the length of the marriage at the time the dissolution judgment was entered. However, the court noted that Frank was entitled to a credit or "set-off" of his maintenance obligation beginning November 1, 2020, as he had paid maintenance in accordance with the calculations set forth in the original dissolution judgment, which was in excess of the amounts in its new order.

¶ 96    The court also found that retroactive maintenance was still appropriate due to the "length of the parties['] marriage and the significant disparities in employment history and prospects" between the parties. The court maintained its previous calculation of $2,355 for temporary maintenance, as well as its finding that Frank was to pay retroactive maintenance from October 2015 to May 2019, for a total of 43 months at $101,265.

¶ 97    Last, the court addressed the dissipation finding. The court agreed that discovery had officially closed on May 31, 2019, and that any mutual agreement to extend discovery had been ineffective at changing the court's previous deadline. However, the court observed that, even before the discovery closure date, it had already found "dissipation to have been occurring in connection with the Delaware Place property" on May 23, 2019. Accordingly, the court concluded that it was "of no moment that Nawara's claim for dissipation was formally issued after the date of the closure of discovery." As such, the court reaffirmed its previous ruling that Frank was obligated to pay $35,525 in dissipation damages.

¶ 98    This appeal followed.[26]

¶ 99                                    II. ANALYSIS

¶ 100                        A. Consolidated and Related Matters

¶ 101   Prior to our discussion of the parties' arguments on appeal, we must also note the complicated procedural posture of this case. After Frank filed his Notice of Appeal, Nawara filed a motion to stay these proceedings pursuant to Supreme Court Rules 301(a)(1) and (a)(2) due to pending actions for sanctions against Frank and his counsel in the trial court. We granted the stay on November 16, 2021, and ordered the parties to file status reports in this case. The stay was subsequently lifted by order on March 9, 2022.

¶ 102   During that interim time period and beyond, Frank's counsel has filed multiple notices of appeal, which have resulted in numerous cases that have either been formally consolidated with this case by court order or deemed related. All of the cases are appeals of sanctions orders in the underlying matter, which respondent's counsel purports to have filed "merely for jurisdictional purposes." See Case No. 1-22-0164 (notice of appeal filed February 3, 2022, appealing a trial court order of January 6, 2022, which levied attorney fees and sanctions in the amount of $28,699; further dismissed for want of prosecution pursuant to our August 31, 2022 order); Case No. 1-22-0176 (notice of appeal filed February 7, 2022, which purports to appeal the trial court's dissolution judgment, order on Frank's motion to reconsider, as well as the sanctions order entered on January 6, 2022; motion to consolidate with our instant case granted on March 9, 2022); Case No. 1-22-

---

[26]Because they are not particularly relevant to our determinations here, we have elected not to discuss the various sanction awards entered by the trial court against Frank and his counsel both during dissolution proceedings and after. However, our review of this record and the various supplemental records show the entry of sanctions on January 6, 2022, and October 13, 2022, as well as a rule to show cause issued against Frank on April 6, 2023.

0711 (notice of appeal filed November 14, 2022 based on an October 13, 2022 sanctions order in the amount of $11,444.49; motion to consolidate granted November 28, 2022, and further indicating that "[t]he briefs filed and to be filed in [the instant case] shall stand as the briefs for [case no. 1-22-1711].");  Case No. 1-23-0802 (notice of appeal filed May 5, 2023, from order of trial court entered April 6, 2023 in relation to contempt proceedings; order to consolidate case with this instant case on May 30, 2023, with "briefs filed [in the instant appeal to] stand as briefs for" that appeal).

¶ 103   Only one case is not consolidated. See Case No. 1-23-0308 (filed November 10, 2022; dismissed for want of prosecution on March 8, 2023, after failing to file the record; order for dismissal for want of prosecution vacated on April 5, 2023). However, this appeal appears to be brought solely by respondent's counsel on his own behalf, and is currently being briefed. Now, we reiterate that the briefs filed in this instant matter—Case No. 1-21-1145—are to serve as the briefings for Case Nos. 1-22-0176, 1-22-1711, and 1-23-0802. Finally, we note that neither the docketing statement nor the briefs in this case raise any arguments concerning the trial court's sanctions orders.

¶ 104                                    B. Arguments

¶ 105   Although Frank's appeal raises multiple issues, they can be categorized into two main concerns, namely: (a) the court's assignment of marital property; and (b) Frank's maintenance obligations. With regard to the former, Frank contends that the court erred in three ways: (1) determining that Frank had dissipated assets; (2) requiring him to reimburse Nawara for health insurance expenses; and (3) assigning Nawara as a beneficiary to his life insurance policy. With regard to the latter, Frank contends that: (1) the court's prospective maintenance findings are in error because it failed to consider Nawara's prior employment history and her receipt of a $145,000

family gift; and (2) the court improperly ordered retroactive maintenance to the date of the petition's filing.

¶ 106    The issues outlined above concern multiple portions of the Act. Thus, we begin with a brief discussion of the statute prior to addressing each issue on appeal, and will address each relevant provision, with the appropriate standard of review, as we move through them in our discussion. We begin with the well-established canons of statutory interpretation, where "[t]he fundamental rule of statutory interpretation is to give effect to the intention of the legislature," with the "best indicator of the legislature's intent [being] the plain language of the statute." *In re Marriage of Rogers*, 213 Ill. 2d 129, 136 (2004). "When the statutory language is clear, it must be given effect without resort to other tools of interpretation." *Id.* However, as we will discuss below, although most of the Act sets forth express requirements for trial courts to follow under certain provisions of the statute, it also allows for some discretion.

C. The Illinois Marriage and Dissolution of Marriage Act[27]

¶ 107    The Act allows for a court to enter a marital dissolution judgment when one of the spouses was a resident of Illinois at the time the action was commenced. 750 ILCS 5/401(a) (West 2016).

---

[27]To further complicate matters, the Act has been amended multiple times since the filing of Nawara's petition, including at the relevant sections concerning marital distribution and maintenance provisions (Pub. Act 99-90, § 5-15 (eff. Jan. 1, 2016) (amending 750 ILCS 5/503 and 5/504)). However, section 801 of the statute expressly states that the 2016 version of the Act will "appl[y] to all pending actions and proceedings commenced prior to its effective date *with respect to issues on which a judgment has not been entered*[.]" (Emphasis added.) 750 ILCS 5/801(b) (West 2016). The petition in this case was filed in 2015, prior to the effective date of the amended statute, January 1, 2016. However, a final judgment was not rendered until 2021, after the effective date of such amendments. Thus, the newer version of the Act applies here. Other amendments have also occurred over time. See Pub. Act 99-763, § 5 (eff. Jan. 1, 2017) (amending 750 ILCS 5/503(b)(1) to clean up language regarding the presumption of marital property and the burden required to overcome such a presumption); see Pub. Act 100-520, § 5 (eff. Jan. 1, 2018) (amending 750 ILCS 5/504(b-1) regarding calculation duration of maintenance); see Pub. Act 100-871, § 5 (eff. Jan. 1, 2019) (amending 750 ILCS 5/503 regarding life insurance policies); see Pub. Act 100-923, § 10 (eff. Jan. 1, 2019) (further amending maintenance determinations at 750 ILCS 5/504(a) and (b)).

Before judgment, a court must consider and make provisions for "the maintenance of either spouse and the disposition of property." 750 ILCS 5/401(b) (West 2016). "The court has the discretion to use the date of the trial or such other dates as agreed upon by the parties, or ordered by the court within its discretion, for purposes of determining the value of assets or property." 750 ILCS 5/403(c) (West 2016).

¶ 108   The Act "was enacted to create a uniform law governing domestic relations." *In re Marriage of Thompson*, 79 Ill. App. 3d 310, 313 (1979). "[A] trial court's authority to act in dissolution proceedings is conferred only by statute" and "[t]he trial court may not rely upon its general equity powers." *In re Marriage of Ignatius*, 338 Ill. App. 3d 652, 657 (2003); see also *In re Marriage of Blum and Koster*, 377 Ill. App. 3d 509, 526 (2007), *rev'd on other grounds* ("The dissolution of marriage is entirely statutory in origin and nature, and courts *** must exercise their powers within the limit of the Act."). However, the Act is also to be "liberally construed" to "promote its underlying purposes." 750 ILCS 5/102 (West 2016). Such purposes include "promot[ing] the amicable settlement of disputes that have arisen between parties to a marriage" (750 ILCS 5/102(3) (West 2016)), "mak[ing] reasonable provision for support during and after an underlying dissolution of marriage" (750 ILCS 5/102(8) (West 2016)), "eliminat[ing] the consideration of marital misconduct in the adjudication of rights and duties incident to the dissolution of marriage" (750 ILCS 5/102(9) (West 2016)), and "mak[ing] provision for the preservation and conservation of marital assets during the litigation" (750 ILCS 5/102(10) (West 2016)).

¶ 109                    1. The Marital Estate (750 ILCS 5/503)

¶ 110   "Before a court may distribute property upon the dissolution of a marriage, it must first classify the property as either marital or nonmarital." *In re Marriage of Stuhr*, 2016 IL App (1st)

152370, ¶ 49 (quoting *In re Marriage of Faber*, 2016 IL App (2d) 131083, ¶ 3)); see also 750 ILCS 5/503(a) (West 2016) ("The court shall make specific factual findings as to its classification of assets as marital or non-marital property, values, and other factual findings supporting its propriety award."). The trial court is to divide the property "in just proportions considering all relevant factors" (750 ILCS 5/503(d) (West 2016)) and has "broad discretion in the distribution of marital assets," with the "touchstone of proper and just apportionment [being] whether it is equitable in nature." (Internal citations omitted.) *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1042 (2008). "An award of property in just proportions does not mean equal proportions, and a trial court does not abuse its discretion in awarding a larger share of the marital property to one party." *Id.*

¶ 111   Section 503(a) presumes that "all property, including debts and other obligations, acquired by either spouse subsequent to the marriage" is marital property. 750 ILCS 5/503(a) (West 2016); see also 750 ILCS 5/503(b)(1) (West 2016). "This presumption includes non-marital property transferred into some form of co-ownership between the spouses, regardless of whether title is held individually or by the spouses in some form of co-ownership such as joint tenancy, tenancy in common, tenancy by the entirety, or community property." 750 ILCS 5/503(b)(1) (West 2016). "The presumption of marital property is overcome by showing through clear and convincing evidence that the property was acquired by a method listed" in sections 503(a)(1-8), which delineate various types of "non-marital property." *Id.*; see also 750 ILCS 5/503(a)(1)-(8) (West 2016).

¶ 112   The statute also discusses pension benefits and life insurance policies. Section 503(b)(2) presumes that "all pension benefits" which are "acquired by or participated in by either spouse after the marriage and before a [dissolution judgment]" to be marital property. 750 ILCS

5/503(b)(2) (West 2016). Applicable pension benefits include those under the Illinois Pension Code, "defined benefit plans, defined contribution plans and accounts, individual retirement accounts, and non-qualified plans[.]" *Id.* "A spouse may overcome the presumption that these pension benefits are marital property by showing through clear and convincing evidence that the pension benefits were acquired by a method" listed in section 503(a)(1-8), which, as noted above, defines non-marital property. *Id.*

¶ 113  Section 503(b-5), which governs allocation of benefits for a life insurance policy, has since been amended.[28] At the time Nawara's petition was filed, the previous version of the provision stated:

> "As to any policy of life insurance insuring the life of either spouse, or any interest in such policy, that constitutes marital property, whether whole life, term life, group term life, universal life, or other form of life insurance policy, and whether or not the value is ascertainable, the court shall allocate ownership, death benefits, or the right to assign death benefits, and the obligation for premium payments, if any, equitably between the parties at the time of judgment for dissolution *** of marriage." 750 ILCS 5/503(b-5) (West 2016).

2. Distribution of Marital Property and Trial Court Findings

Section 503(d) was also amended in 2016 and provides a list of factors for trial courts to consider when "assign[ing] each spouse's non-marital property to that spouse" and "divid[ing] the marital property without regard to marital misconduct in just proportions[.]" 750 ILCS 5/503(d)

---

[28]Section 503(b-5) was first amended in 2016, where it added the term "existing" to "any policy of insurance." See Pub. Act 99-90, § 5-15 (eff. Jan. 1, 2016). It was again amended by Pub. Act 100-871, § 5, (eff. Jan. 1, 2019), which does not apply to our proceedings today.

(West 2016).[29] "Generally, the trial court's classification of an asset as marital or nonmarital will not be disturbed unless it is contrary to the manifest weight of the evidence." *Stuhr*, 2016 IL App (1st) 152370, ¶ 49 (quoting *Faber*, 2016 IL App (2d) 131083, ¶ 3)). "A decision is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based upon the evidence." *Id.* (quoting *Faber*, 2016 IL App (2d) 131083, ¶ 3)). Although "a trial court's property classification will not be disturbed unless it is contrary to the manifest weight of the evidence, its *final* division of marital property will not be disturbed unless the trial court clearly abused its discretion." (Emphasis added.) (Internal citations omitted). *In re Marriage of Woodrum*, 2018 IL app (3d) 170369, ¶ 101.

¶ 114    We turn now to the trial court's findings pursuant to section 503(d), which, by its own language, ultimately informed both its marital distribution and maintenance findings.[30] Section 503(d)(1), or "factor 1," evaluates:

> "[E]ach party's contributions to the acquisition, preservation, or increase and decrease in value of the marital or non-marital property, including (i) any decrease attributable to an advance from the parties' marital estate under subsection (c-1)(2) of section 501; (ii) the contribution of a spouse as a homemaker or to the family unit; and (iii) whether the contribution is after the commencement of a proceeding for dissolution of marriage ***[.]" 750 ILCS 5/503(d)(1) (West 2016).

---

[29]For purposes of efficiency and ease of read, we shall recite such factors along with the trial court's findings together in a joint discussion shortly.

[30]In its analysis, the court determined that the following statutory factors did not apply: factor six (750 ILCS 5/503(d)(6) (West 2016) (no evidence presented that either party was married previously); factor seven (750 ILCS 5/503(d)(7) (West 2016) (no evidence of any prenuptial or postnuptial agreements); factor nine (750 ILCS 5/503(d)(7) (West 2016) (no minor children, therefore no necessary custodial agreements); and factor twelve (750 ILCS 5/503(d)(12) (West 2016) (neither party presented any evidence regarding the tax consequences of their property division based on respective economic circumstances). We agree that these factors do not apply.

¶ 115 The court determined that "both parties had contributed to the acquisition, preservation, and increase in value of the marital estate."

¶ 116 Subsection 503(d)(2), or "factor two," states:

"[T]he dissipation by each party of the marital property, provided that a party's claim of dissipation is subject to the following conditions: (i) a notice of intent to claim dissipation shall be given no later than 60 days before trial or 30 days after discovery closes; whichever is later; (ii) the notice of intent to claim dissipation shall contain, at a minimum, a date or period of time during which the marriage began undergoing an irretrievable breakdown, an identification of the property dissipated, and a date or period of time during which the dissipation occurred; (iii) a certificate or service of the notice of intent to claim dissipation shall be filed with the clerk of the court and be served pursuant to applicable rules; (iv) no dissipation shall be deemed to have occurred prior to 3 years after the party claiming dissipation knew or should have known of the dissipation, but in no event prior to 5 years before the filing of the petition for dissolution of marriage[.]" 750 ILCS 5/503(d)(2)(i)-(iv) (West 2016).

¶ 117 On this factor, the court found that Frank had dissipated marital property, namely the Delaware property, by not renting it out and thus failing to generate income after August 31, 2015, which was a period of 49 months. However, the court acknowledged that, per Frank's testimony, he had begun to rent it out in October 2019. The court noted that it had also first found that dissipation of the property had occurred on May 23, 2019, during an in-court proceeding.

¶ 118 Subsection 503(d)(3), or "factor three," evaluates "the value of the property assigned to each spouse." 750 ILCS 5/503(d)(3) (West 2016). The trial court found that it did not yet have a

proper valuation concerning Frank's retirement benefits, and as such ordered the parties to retain an outside party to further allocate fifty percent of Frank's retirement plans to Nawara.

¶ 119   Subsection 503(d)(4), or "factor four," considers "the duration of the marriage" (750 ILCS 5/503(d)(4) (West 2016), which the court found to be 26 years and 10 months at the time of dissolution.

¶ 120   Subsection 503(d)(5), or "factor five," assesses "the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having the primary residence of the children." 750 ILCS 5/503(d)(5) (West 2016). The court found that Nawara had "very little employment history" and was at a "significant disadvantage in relation to her future employment prospects given her age, relative lack of work history, and the present economic downturn, whereas Frank had been employed at a considerable income for his entire adult life."

¶ 121   Subsection 503(d)(8), or "factor eight," evaluates the "age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties." 750 ILCS 5/503(d)(8) (West 2016). The court noted that, at the time of dissolution, Nawara was 53 years old and Frank was 64. The court found that "Frank ha[d] been employed throughout his entire adult life, and was able to purchase three properties in addition to Unit A during the parties' marriage." In contrast, the court observed that "Nawara was a homemaker for a majority of their marriage, accumulating a work history of only a few years as a pharmacist and having considerable difficulty in securing new employment given her age, relative lack of work history, overall absence from the workforce during the parties' marriage, and the

economic pressures pertaining to her occupation specifically and to the economy and the workforce more broadly, particularly this year with the COVID-19 pandemic."

¶ 122    Subsection 503(d)(10), or "factor ten," considers "whether the apportionment is in lieu of or in addition to maintenance." 750 ILCS 5/503(d)(10) (West 2016). The court indicated that its "distribution of the marital estate would be in addition to the maintenance."

¶ 123    Subsection 503(d)(11), or "factor 11," evaluates "the reasonable opportunity of each spouse for future acquisition of capital assets and income." 750 ILCS 5/503(d)(11) (West 2016). The court observed that Frank was nearing retirement age, but had worked during his entire adult life for a "considerable income" and had considerable retirement assets. In contrast, the court found that "neither circumstance applie[d] to Nawara" given her age, relative lack of work history, overall absence from the workforce during the parties' marriage, and the specific economic pressures related to her occupation and economy. As such, the court found that Nawara "did not have a reasonable opportunity, in the absence of the provisions regarding distribution and maintenance, to acquire capital assets and income."

¶ 124    With these findings in mind, we now turn to the court's determinations related to dissipation, health insurance, and life insurance.

¶ 125                                   a. Dissipation Finding

¶ 126    Procedurally, Frank contends that Nawara's notice was untimely pursuant to section 503(d)(2) of the Act, as it was filed a few days prior to trial and after closure of discovery, and that the trial court's purported finding of dissipation during the hearing for temporary maintenance was insufficient to circumvent the statutory deadlines. Substantively, assuming that the notice was proper, Frank challenges the dissipation finding of forty-nine months, where, according to him, the evidence showed that the unit had either been rented out or occupied by friends and family and

during that time period. Finally, in the event that the finding was proper in any manner, Frank contends that the amount charged against him must be charged against the marital estate, and not in his post-division share.

¶ 127    Preliminarily, Nawara responds that Frank's objection to the notice is waived because he did not object to it until May 15, 2020, following the completion of trial. Substantively, Nawara maintains that the notice was timely because it was filed nine days after the parties' depositions on June 26, 2019, which occurred after the parties agreed to extend discovery. Nawara further characterizes Frank's challenge as "moot" because the court did not award dissipation for funds used to purchase the Delaware property, but rather, potential income it could be generating as marital property. Finally, Nawara contends that the evidence both during the hearing for temporary maintenance and at trial support a finding that the property was dissipated.

¶ 128    As noted above, section 503(d)(2) assesses the potential dissipation of marital assets during the court's distribution of marital property. 750 ILCS 5/503(d)(2) (West 2016). "The concept of dissipation is premised upon waste," specifically the "diminution in the marital estate's value due to a spouse's actions." *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶ 67. Put another way, "[d]issipation occurs when one spouse uses marital property for his or her sole benefit while the marriage is undergoing an irreconcilable breakdown." (Internal citations omitted.) *Stuhr*, 2016 IL App (1st) 152370, ¶ 65. Dissipation may occur even if the spouse may not necessarily derive a personal benefit from it, such as if the expenditure ultimately has some detrimental effect upon the marital estate. *Brown*, 2015 IL App (5th) 140062, ¶ 67. Relevant here, courts have held that dissipation may be found where a party misappropriates rental proceeds. See *In re Marriage of Schuster*, 224 Ill. App. 3d 958, 979-80 (1992).

¶ 129    Whether conduct constitutes dissipation depends on the facts of that particular case. *In re Marriage of Patel and Sines-Patel*, 2013 IL App (1st) 112571, ¶ 71. The party alleging dissipation must make a preliminary, or *prima facie*, showing of dissipation. *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 78; see also *Brown*, 2015 IL App (5th) 140062, ¶ 66. If such a showing is made, the burden then shifts to the party charged with dissipation to show, by clear and convincing evidence, how the funds were spent. *Hamilton*, 2019 IL App (5th) 170295, ¶ 78; see also *In re Marriage of Adams*, 183 Ill. App. 3d 296, 301 (1989). "Vague and general testimony that marital assets were used for marital expenses is inadequate to meet the spouse's burden to show *** how funds were spent." *Brown*, 2015 IL App (5th) 140062, ¶ 69; see also *In re Marriage of Seversen*, 228 Ill. App. 3d 820, 825 (1989) (observing that inadequate explanations found where the charged party merely testified that money was spent to "live on and pay the bills" or for general cost of living and other bills); see also *In re Marriage of Hensley*, 210 Ill. App. 3d 1043, 1053-54 (1991) (dissipation found even where charged party showed accounting of all major payments, but otherwise provided vague statements that did not account for other living expenses).

¶ 130    Although factual determinations concerning dissipation are subject to the manifest weight of the evidence standard, a court's overall final disposition of property is subject to the abuse of discretion standard. See *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 204-05 (2005) (discussing confusion between courts regarding the standard of review for claims of dissipation); compare *In re Marriage of Schmidt*, 242 Ill. App. 3d 961, 972 (1993) ("Whether there was dissipation is a question for the trial court and its determination will not be set aside absent an abuse of discretion."); see also *In re Marriage of Evanoff and Tomasek*, 2016 IL App (1st) 150017, ¶ 37.

¶ 131   Prior to addressing the merits, we must first address Nawara's contention that Frank has waived his procedural challenge to the notice. It is well-settled that issues not raised in the trial court are deemed waived, and are improper if raised for the first time on appeal. *Pinske v. Allstate Property and Casualty Insurance Co.*, 2015 IL App (1st) 150537, ¶ 18. The terms "waiver" and "forfeiture" are often used interchangeably but do possess distinct meaning, with "waiver" referring to the "voluntary relinquishment of a known right," and forfeiture characterizing a party's "failure to make the timely assertion of the right." *Id.* Regardless of the characterization, waiver and forfeiture rules serve as "an admonition to litigant[s], rather than a limitation upon the jurisdiction of the reviewing court" and that we may sometimes override such considerations to receive a "just result and maintain a sound and uniform body of precedent." *Id.* ¶ 19. Our review of the record shows that Frank challenged the timing of dissipation notice in the trial court in two ways. First, Frank cited to the relevant notice provision contained in section 503(d)(2), albeit he did not proffer a full-fledged argument in that regard. Nevertheless, in his motion to reconsider, Frank raised a challenge to the notice's timing, which was further addressed by the court. Thus, we find that Frank sufficiently challenged the dissipation finding below, and will assess the parties' arguments on this point.

¶ 132   On this issue concerning the timing of the dissipation notice, which is expressly set forth within the Act, our review of the trial court's ruling on this matter is *de novo* as it concerns an issue of statutory interpretation. *Rogers*, 213 Ill. 2d at 135. Section 503(d)(2) delineates express procedural requirements to claim dissipation of assets, specifically the filing of a: (i) notice of intent to claim dissipation, which "shall be given *no later than 60 days before trial* or *30 days after discovery closes, whichever is later*," and must be accompanied by a filed certificate or service of the notice. (Emphasis added.) 750 ILCS 5/503(d)(2)(i), (iii) (West 2016). The notice "shall

contain, at a minimum, a date or time period during which the marriage began undergoing an irretrievable breakdown, an identification of the property dissipated, and a date or time period during which the dissipation occurred." 750 ILCS 5/503(d)(2)(ii) (West 2016).

¶ 133    This notice requirement took effect on January 1, 2013, well before the filing of Nawara's petition in 2015. See Pub. Act 97-941, § 5 (eff. Jan. 1, 2013) (amending 750 ILCS 5/503(d)(2). Prior to this amendment, courts often utilized their inherent equitable powers to determine the propriety of a dissipation claim. On this point, we find the Fifth District's discussion in *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, illustrative in highlighting the effect of the notice requirement on such claims. In *Hamilton*, a party filed a notice of intent to claim dissipation within thirty days of discovery closure, rendering it timely under one provision of the section 503(d)(2), but conversely, the notice was simultaneously filed during trial proceedings, and thus not filed within sixty days of trial as required by the other half of the provision. *Id.* ¶¶ 73-74. The court ultimately found the notice to be timely, based on its adherence to some parts of the notice requirement, as well as through fairness considerations, and reasoned as follows:

"We are guided in this determination by cases that arose before the requirement of a notice of intent went into effect. [Internal citations omitted.] Such cases addressed the issue in terms of fairness to the party charged with dissipation or forfeiture by the party claiming dissipation. They held that trial courts could find dissipation as long as the party found to have dissipated assets had sufficient notice to refute the claim. See, *e.g. In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶¶ 60-62 *** (finding that the husband did not forfeit his claim of dissipation despite his failure to file a notice of intent pursuant to a local court rule where various pretrial pleadings made it clear to the wife that he intended to raise the issue); *In re Marriage of Vancura*, 356 Ill. App. 3d 200 *** (2005) (upholding

- 50 -

the trial court's *sua sponte* finding of dissipation where the record indicated that the parties were put on notice that dissipation would be an issue); *In re Marriage of Henke*, 313 Ill. App. 3d 159 \*\*\* (2000) (upholding a court's finding of dissipation even though the wife did not expressly charge the husband with dissipation where her attorney presented evidence on the question and the husband had the opportunity to refute the claim); *In re Marriage of Davis*, 215 Ill. App. 3d 763 \*\*\* (1991) (finding that the wife did not forfeit her claim of dissipation where the record showed that the husband 'knew from the start of trial' that she intended to assert the claim).

We recognize that the statutory amendment would change the results of these cases, particularly those in which the court found dissipation *sua sponte*, because the notice required by the statutory amendment is *mandatory*. See 750 ILCS 5/503(d)(2)(i) (West 2014) (providing that the requisite notice "*shall*" be given (emphasis added)). However, we also recognize that the facts underlying claims of dissipation often remain hidden until they are uncovered during the process of discovery or even through testimony at trial. See, *e.g.*, *In re Marriage of Zweig*, 343 Ill. App. 3d 590, 599 \*\*\* (2003) (describing evidence that the wife 'secreted away' marital assets). *We therefore believe that a claim of dissipation should be considered as long as it complies with the express requirements of the statute and also comports with the notions of fairness* that animated [previous decisions prior to the amendment]." (Emphasis added.) 2019 IL App (5th) 170295, ¶¶ 75-76.

¶ 134 The facts of this case fall somewhere in the middle of the situation described in *Hamilton*. Clearly there are issues of timeliness, as Nawara's notice was filed on July 5, 2019, which was three days prior to the start of trial. The record also reflects that the official discovery closure deadline was May 31, 2019. Thus, Nawara's notice was technically untimely with regard to the

discovery deadline cutoff (thirty-five days past) and the start of trial (three days prior trial, and not the required sixty days per the statute).

¶ 135   But as shown throughout these proceedings, nothing about this case could be that simple. To begin, the record reflects that the parties agreed to continue discovery past the deadline to take the parties' depositions, although there is no indication that a formal deadline was ever set between them. The court addressed this agreement during an August 26, 2019 hearing, where it observed that although the parties were able to make agreements regarding depositions, no written discovery could be issued past the deadline without violating the court's order. This comment was reiterated by the court again in its order on Frank's motion to reconsider, in which the court wrote that discovery had closed on May 31, 2019, and that whatever stipulations the parties may have agreed to had not been "effective" at modifying the court's previously ordered deadline.

¶ 136   Nevertheless, we observe that the court's strenuous adherence to discovery deadlines appears to run counter to its decision regarding the timeliness of Nawara's notice. In its order addressing Frank's motion to reconsider, the court rejected Frank's timeliness argument by maintaining that it had already made a dissipation ruling on May 23, 2019, during the hearing for Nawara's motion for temporary maintenance, when it first learned that Frank had not been renting the Delaware property. The court reasoned, "it [was] of no moment that Nawara's claim for dissipation was formally issued after the date of the closure of discovery." Thus, the court appeared to make what it calls its initial dissipation finding *sua sponte.*

¶ 137   Ultimately, we do not find Nawara's argument, or the trial court's attempt to save its dissipation ruling, to be persuasive. It is true that, pursuant to Supreme Court Rule 218, that parties may agree to modify deadlines related to trial procedure. See Ill. S. Ct. R. 218(c) (eff. July 1, 2014) ("All dates set for the disclosure of witnesses, including rebuttal witness, and the *completion of*

*discovery* shall be chosen to ensure that discovery will be completed no later than 60 days before the date on which the trial court reasonably anticipates that trial will commence, *unless otherwise agreed by the parties*."). (Emphasis added.) However, the goal of the rule is to "prevent the potential for discovery abuse and delay which might otherwise result." See Ill. S. Ct. R. 218, Committee Comments (rev. June 1, 1995). As such, the purpose of Rule 218 is to allow the parties a full and fair opportunity to litigate their case, eliminate surprise and unfairness, and prevent last-minute, frantic pleadings, which are unfortunately demonstrated throughout the course of this litigation by both parties. See *Florez v. Northshore University Healthsystem*, 2020 IL App (1st) 190465, ¶ 57. Here, the record reflects that the trial court extended the parties' discovery deadlines multiple times during the course of the case's four-year duration prior to trial beginning on July 8, 2019. The trial court's understandable frustration with the parties is reflected within the report of proceedings, as it consistently reminded the parties of the case's duration on its docket. Thus, in that regard, we agree with the trial court that the attempt to extend the discovery deadline was insufficient and do not find any error on that part.

¶ 138 However, we do not agree with the trial court that Nawara's untimely notice was of "no moment" due to its previous purported finding of dissipation prior to trial. Although the Act is to be liberally construed to promote its underlying purposes, we are mindful that dissolution proceedings are "entirely statutory in nature and origin," and courts must exercise their powers within the limit of the Act." *Blum and Koster*, 377 Ill. App. 3d at 526; see also *Ignatius*, 338 Ill. App. 3d at 657 ("[A] trial court's authority to act in dissolution proceedings is conferred only by statute" and a "trial court may not rely upon its general equity powers."). Nawara's motion for temporary maintenance did not include a notice, let alone even a request for finding of dissipation of assets for the Delaware property. Moreover, the interim maintenance order issued after the

hearing also did not include a finding of dissipation. Nor could it have, because there had been no evidence presented concerning that issue other than general questioning by the court, and Frank was not given time to rebut the dissipation claim as the nature of the temporary maintenance hearing was, as correctly noted by the court, summary in nature.

¶ 139 Going further, the trial court made no mention of the governing statutory provision in addressing the untimeliness of the notice, and attempted to justify its decision on the basis that it had already made such a finding. Putting aside the fact that the court's purported finding during that hearing was made without any allowance for Frank to rebut any *prima facie* finding that Nawara had raised the dissipation claim effectively, which we do not find that she did, the trial court's authority is dictated by the statute, which requires timely notice, which, as noted in *Hamilton*, is mandatory. There is also no evidence that Frank was attempting to withhold information regarding the Delaware property during the discovery process. See *Hamilton*, 2019 IL App (5th) 170295, ¶ 76. Indeed, almost four years passed between the petition's filing and the start of trial, which certainly gave both parties enough time to engage in discovery concerning any potential dissipation. Thus, although it is clear that the unambiguous statutory requirements governing dissipation claims were not followed, it is also worth noting that the court's finding for dissipation does not comport with fundamental fairness considerations. *See Hamilton*, 2019 IL App (5th) 170295, ¶¶ 75-76 ("We therefore believe that a claim of dissipation should be considered as long as it complies with the express requirements of the statute and also comports with the notions of fairness that animated [previous decisions prior to the amendment]."

¶ 140 Thus, we find that Nawara's notice for dissipation of assets was untimely and therefore procedurally improper. As such, we do not otherwise address the trial court's substantive ruling

on this issue, except to note that the dissipation award of $35,525 as to the Delaware property is reversed. Upon remand, the trial court is ordered to credit the $35,525 back to Frank.[31]

¶ 141                              b. Life Insurance Designation

¶ 142   Next, Frank contends that the court's order requiring him to maintain Nawara as a beneficiary on his life insurance policy was in error. According to Frank, the court improperly ordered her re-designation in order to "secure his maintenance obligations," which ultimately results in a "windfall" to Nawara. Second, Frank argues that insurance coverage is not a marital asset, citing *In re Marriage of Mullins*, 121 Ill. App. 3d 86 (1984) in support, and even assuming it was, Nawara did not list it as such in her closing statement. Finally, Frank contends that, because his policy ends upon his retirement, the requirement is not maintainable and unable to be modified pursuant to section 510(b) of the Act.

¶ 143   Initially, Nawara responds that any argument about the policy is waived, as Frank did not raise it in his closing argument or in his motion to reconsider. Next, Nawara contends that Frank's characterization of the award misstates the trial court's ruling, which does not provide that the policy is in place to secure Frank's maintenance obligations. Finally, Nawara asserts that section 503(b-5)(1) of the Act expressly allows for the trial court to allocate death benefits of an existing group term life policy.

---

[31]We note, however, that dissipation is generally calculated beginning when the "marriage began undergoing an *irretrievable breakdown*." (Emphasis added.) 750 ILCS 5/503(d)(2)(ii) (West 2016); see also *In re Marriage of O'Neill*, 138 Ill. 2d 487, 491 (1990) (interpreting previous version of the dissipation provision that utilized the word "irreconcilable" instead of "irretrievable," and holding that dissipation may only be found where marital property is utilized by one spouse "*at a time that the marriage is undergoing an irreconcilable breakdown*.") (Emphasis added.) Here, the trial court found that dissipation of the Delaware property occurred on or beginning around September 2015, but in its dissolution judgment also noted that the "parties [had] been separated and living separately since June of 2015" without any specific date as to the date of irretrievable breakdown. Consequently, Nawara's petition, filed in September 2015, is considered to have been filed after the marriage broke down.

¶ 144   We first address whether Frank's challenge to the life insurance benefit has been waived. Although Nawara did not provide any detailed discussion regarding the policy in her closing argument, she listed it on page 61 of her submission and further requested him to designate her as a beneficiary. Notably, Nawara did not ask for the life insurance policy to serve as a security for maintenance payments. Interestingly, despite providing brief testimony regarding the policy at trial, Frank did not include it in his own closing argument, and did not raise it as an issue in his motion to reconsider, even though the dissolution judgment expressly provided that he was to maintain a $300,000 life insurance policy with Nawara as a beneficiary. Thus, it appears that Frank has raised the issue of life insurance for the first time on appeal.

¶ 145   Accordingly, we agree with Nawara that the issue has been waived. Even if we were to consider the substance of the order, contrary to Frank's contention, as noted prior, section 503(b-5) of the Act allows the trial court to allocate assignments of death benefits for life insurance policies if they constitute marital property, although we are also mindful that the court did not list the policy as a marital asset in its dissolution judgment. See 750 ILCS 5/503(b-5) (West 2016); 750 ILCS 5/503(f)(1) (West 2022). In addition, the statute at both the time of the petition's filing and its current version also allows for an insurance policy to serve as a security for maintenance obligations. See 750 ILCS 5/504(f) (West 2014), (West 2022) ("An award ordered by a court upon entry of a dissolution of judgment or upon entry of an award of maintenance *** may be reasonably secured, in whole or in part, by life insurance on the payor's life on terms as to which the parties agree or, if the parties do not agree, on such terms determined by the court[.]"); see also *Walker*, 386 Ill. App. 3d at 1047 (noting that sections 503 and 504 of the Act are "sufficiently broad to allow the trial court to award a form of security for a maintenance obligation, not necessarily limited to life insurance.").

¶ 146                              c. Reimbursement of Health Insurance Premiums

¶ 147   For his last argument concerning the marital estate, Frank argues that the trial court erred by requiring him to reimburse Nawara for her health insurance payments incurred after he temporarily removed her from his plan. Preliminarily, Frank points out that Nawara listed her health insurance expenditures as "dissipation" and that, assuming the dissipation notice is found to be improper, such a request should also be stricken. Additionally, Frank argues that there is no statutory authority to "compensate" Nawara for her expenditures because "marital distributions are supposed to be without consideration of fault" and thus is an "improper" "compensation award." Further, Frank continues, the court erred in ordering him to pay her expenses out his share of the marital property following dissolution, when, if health insurance is a marital asset, such expenditures should have been reimbursed by marital money.

¶ 148   Nawara replies that Frank has also waived this issue, as he failed to challenge the trial court's finding in the motion to reconsider. Substantively, Nawara argues that the court properly ordered Frank to reimburse her for health insurance premiums incurred after he removed her from his employer health plan without consent.

¶ 149   We again return to the issue of waiver. Although it is true that Frank did not challenge the court's health insurance ruling in its dissolution judgment, Frank objected to Nawara's initial request in a response filing and attached counter-affidavit. Frank's counsel also made arguments concerning health insurance during in-court proceedings during the temporary maintenance hearing. Thus, it does appear that Frank did challenge this issue in the trial court, albeit not artfully, and thus we turn to the merits of the parties' arguments.

¶ 150   Section 503(b)(2) characterizes certain pension benefits as marital property if either "acquired by or participated in by either spouse after the marriage and before a judgment of

dissolution" as "marital property." 750 ILCS 5/503(b)(2) (West 2016). "A spouse may overcome the presumption that these pension benefits are marital property by showing clear and convincing evidence that the pension benefits" are otherwise non-marital property. *Id.*

¶ 151   Here, the trial court ordered Frank to restore Nawara to his health plan and reimburse her for costs in its May 23, 2019 ruling and subsequent order following the temporary maintenance hearing, and the court reiterated this finding in its dissolution judgment. Frank does not argue that his health plan was non-marital property, but rather challenges the court's authority to require him to reimburse Nawara for her healthcare expenses. As Frank did not overcome the presumption that such benefits are not marital property, and section 503(b)(2) encompasses such benefits, we cannot say it was unreasonable for the trial court to require reimbursement of such costs that Nawara incurred when he removed her from the plan, as she did not have her own at the time. See *In re Keon C.*, 344 Ill. App. 3d 1137, 1146 (2003) ("The trial court has discretion to order payment of a health insurance premium," and such a finding "will not be disturbed on review absent an abuse of discretion."); see also *Evanoff & Tomasek*, 2016 IL App (1st) 150017, ¶ 53 (even where there are discernible guidelines regarding contingent medical expenses not covered by insurance, the trial court still has discretion to order the payment of uncovered and extraordinary medical expenses).

¶ 152   We further note that, although Frank contends that he was unable to challenge any of Nawara's medical expenses during the temporary maintenance hearing, he did not make an effort to challenge them at trial, despite being directly asked about them during his testimony. His explanation for why he removed her was that she was "abusing" his healthcare plan, but there is no evidence in the record to suggest that such activities occurred. Accordingly, we do not find that the trial court abused its discretion in requiring Frank to reimburse Nawara for her incurred health

care expenses. See *Schmidt*, 242 Ill. App. 3d at 974 (trial court did not abuse its discretion in requiring husband who carried health insurance policy to incur wife's medical expenses); see also *Evanoff & Tomasek*, 2016 IL App (1st) 150017, ¶¶ 53-54 (affirming trial court's ruling of spouse to reimburse uncovered medical expenses based in part on parties' financial situations).

¶ 153   With regard to Frank's argument, in assuming that we find reimbursement to be proper, that such expenditures should be paid out of the marital estate, we observe the one case cited by Frank in support of this proposition is *In re Marriage of Heroy*, 385 Ill. App. 3d 640 (2008). However, as correctly noted by Nawara, *Heroy* is distinguishable on its facts. In *Heroy*, appellant spouse sought reversal of the trial court's retroactive temporary maintenance award on multiple bases. *Id.* at 658-60. Although the appellate court affirmed the ultimate conclusion that retroactive maintenance was proper, it agreed with the appellant that the amount to be paid should come from the marital estate, rather than the husband's post-division share. *Id.* at 659-60. Here, in contrast, all health insurance expenditures paid by Nawara were due to Frank's improper actions of removing her from his plan prior to dissolution, and thus causing her to incur expenses that would not have been otherwise borne by the marital estate. Thus, we do not find *Heroy* applicable to the circumstances here, and do not find any error. As such, we further affirm the trial court on this basis.

¶ 154                              3. Maintenance – Temporary and Term

¶ 155   Having disposed of the marital property distribution issues, we turn to the other half of Frank's appeal concerning the trial court's maintenance determinations. Specifically, he challenges: (1) the trial court's income imputation of $25,000 to Nawara; (2) its finding that Nawara's receipt of $145,000 constituted a gift and not income for purposes of maintenance

calculation; and (3) its imposition of retroactive maintenance to the date of the petition's filing. We again begin with the relevant portions of the Act.

¶ 156                           a. Section 504 (Maintenance)

¶ 157   The Act governs the awarding of a temporary maintenance award (750 ILCS 5/501 (West 2016)) and a more permanent award following a dissolution judgment. 750 ILCS 5/504(a) (West 2016). Generally, courts are empowered to determine entitlement to and details concerning a maintenance award for "either spouse in amounts and for periods of time as the court deems just[.]" 750 ILCS 5/504(a) (West 2016). The maintenance award "may be paid from the income or property of the other spouse." *Id.* "Maintenance is designed to allow the recipient former spouse to maintain the standard of living enjoyed during the marriage." *In re Marriage of Johnson*, 2016 IL App (5th) 140479, ¶ 93. The statute defines three types of maintenance based on the length of their terms. See 750 ILCS 5/504(b-4.5) (West 2016). Such types include "fixed-term maintenance," "indefinite maintenance," and "reviewable maintenance." *Id.* § 504(b-4.5)(1)-(3). Relevant here, "fixed-term maintenance" is where the court "designate[s] the termination of the period during which this maintenance is to be paid" and is then barred at the end of such period. *Id.* § 504(b-4.5)(1).

¶ 158   Additionally, because maintenance "is designed to allow the recipient former spouse to maintain the standard of living enjoyed during the marriage," courts also characterize maintenance awards based on their specific purpose. *Johnson*, 2016 IL App (5th) 140479, ¶ 93. The common characterizations are "permanent maintenance, rehabilitative maintenance for a fixed term, rehabilitative maintenance subject to review, and maintenance in gross." *In re Marriage of Chapa*, 2022 IL App (2d) 210772, ¶ 38. Relevant here are the concepts of permanent and rehabilitative maintenance. "Rehabilitative maintenance is appropriate where the evidence shows a potential for

future employability at an income that allows approximately the same standard of living established during the marriage." *Johnson*, 2016 IL App (5th) 140479, ¶ 93. "Inherent in the concept of rehabilitative maintenance is the ultimate goal that after renewing or developing skills, or reentering the job market, the recipient former spouse will be able to become self-sufficient through her own income." *Id.*

¶ 159   In contrast, a permanent maintenance award is appropriate "where it is evident that the recipient former spouse is either unemployable or has employment skills[,] but there is a discrepancy between her probable future income and the amount of income that would provide the standard of living she enjoyed during the marriage." *Id.*; see also *Walker*, 386 Ill. App. 3d at 1044 ("[P]ermanent maintenance should be awarded where a spouse is not employable or is only employable at a lower income as compared to the spouse's previous standard of living" and a "spouse should not be required to lower the standard of living established in the marriage as long as the payor spouse has sufficient assets to meet his [or her] needs and the needs of his former spouse."). In addition, permanent maintenance is generally appropriate where a spouse has devoted significant time to raising a family instead of pursuing a career." *Johnson*, 2016 IL App (5th) 140479, ¶ 93. Overall, a maintenance award, whether temporary or permanent in nature, must be reasonable, which will depend on the case's individual circumstances. *Heroy*, 385 Ill. App. 3d at 652.

¶ 160                              *i. Determination of a Maintenance Award*

¶ 161   The Act's maintenance provisions were amended in 2015. See Pub. Act 99-90, § 5-15 (eff. Jan. 1, 2016) (amending 750 ILCS 5/504); see also *In re Marriage of Burdess*, 2020 IL App (3d) 190342, ¶ 16; see also *Johnson*, 2016 IL App (5th) 140479, ¶ 108. Prior to amendment, courts used statutory factors to determine whether to award maintenance, and if appropriate, its amount

and duration. *Burdess*, 2020 IL App (3d) 190342, ¶ 16. The amended statute still uses similar factors, but now calculates the amount and duration of the award based on guideline formulas set forth therein that include income ranges and statutory caps. See *Id.*; see also *In re Marriage of Cole*, 2016 IL App (5th) 150224, ¶¶ 7-8 (discussing changes to the Act). The trial court must make specific findings of fact for any maintenance determinations, including its reasons for awarding or not awarding it, based on the relevant statutory factors. 750 ILCS 5/504(b-2), (b-2)(1) (West 2016). The court must also make findings and explain its reasoning when it deviates from the statutory guidelines, and if so and further determinable, what the amount and duration of the award would have been as required from the guidelines. See 750 ILCS 5/504(b-2)(2) (West 2016). Finally, the court must state whether the award is fixed-term, indefinite, reviewable, or reserved. 750 ILCS 5/504(b-2)(3) (West 2016).

¶ 162   "Determining the propriety, amount, and duration of a maintenance award is within the trial court's discretion." *Johnson*, 2016 IL App (5th) 140479, ¶ 93. When a party challenges the trial court's factual findings regarding maintenance, a reviewing court will affirm unless the court's findings were clearly against the manifest weight of the evidence. *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 30. "Findings are against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." (Internal quotations omitted.). *Id.* However, the court's ultimate decision to award maintenance will not be reversed on appeal absent an abuse of discretion." *Walker*, 386 Ill. App. 3d at 1041; see also *Johnson*, 2016 IL App (5th) 140479, ¶ 93. "An abuse of discretion occurs when no reasonable person would adopt the view taken by the trial court." *Walker*, 386 Ill. App. 3d at 1041.

¶ 163                    *ii. Whether a Maintenance Award is Appropriate*

¶ 164   As noted prior, in determining whether maintenance should be awarded, the court must evaluate the case based on relevant statutory factors contained in section 504(a) of the Act. See 750 ILCS 5/504(a) (West 2016). We again observe that here, the trial court made express findings as to section 503's factors when determining the marital estate, and although some of those factors overlap with those in section 504(a), they are not entirely the same.[32] Further, some of the factors cannot be ascertained without the court first determining what constitutes marital and non-marital property. See *e.g.*, 750 ILCS 5/504(a)(1) ("[T]he income and property of each party, *including marital property apportioned and non-marital property assigned to the party seeking maintenance*[.]"). (Emphasis added.) Thus, we now recite section 504(a)'s factors in full here, which include:

> "(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance[,] as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;
>
> (2) the needs of each party;
>
> (3) the realistic present and future earning capacity of each party;
>
> (4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having foregone or delayed education, training, employment, or career opportunities due to the marriage;
>
> (5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

---

[32]However, so long as "the basis for an award of maintenance is established in the record, it is not *mandatory* that the trial court make explicit findings for each of the statutory factors." (Emphasis added.) *Blum and Koster*, 235 Ill. 2d at 38.

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a)(1)-(14) (West 2016).

¶ 165    "Trial courts have wide latitude in considering which factors should be used in determining reasonable needs, and the court is [also] not limited to the factors listed in the statute." *Brill*, 2017 IL App (2d) 160604, ¶ 28. "No single factor is determinative of the propriety of a maintenance award." *Id.*

¶ 166                                      *iii. Calculating the Maintenance Award*

¶ 167   Once a court finds that maintenance is appropriate, it then determines the amount of the award based on the guidelines set forth in the statute. 750 ILCS 5/504(b-1), (b-1.5), (b-2) (West 2016). The initial calculation is based on the parties' "combined gross annual income," which is capped at $500,000, in conjunction with any other child support or other maintenance obligations. *Id.* § 504(b-1)(1) (West 2016). Specifically, if application of the guidelines results in a "combined maintenance and child support obligation that exceeds 50% of the payor's net income," the court is then allowed to deviate from the statutory formula based on its prior assessment of the relevant maintenance factors. *Id.* If the combined gross annual income is less than $500,000, maintenance is calculated by taking 33 1/3 % of the payor's net annual income, and then subtracting 25% of the payee's net annual income from that amount. *Id.* § 504(b-1)(1)(A) (West 2016). If that total sum is in excess of 40% of the combined net income of the parties, the court must adjust the amount accordingly. The court's determination of the parties' income is a factual matter and will not be disturbed absent an abuse of discretion. *Evanoff & Tomasek*, 2016 IL App (1st) 150017, ¶ 23.

¶ 168                     *iv. Calculating the Duration of the Maintenance Award*

¶ 169   Finally, the court must determine the duration of the award, which is primarily based on the marriage's duration. 750 ILCS 5/504(b-1)(1)(B). Relevant here, "[f]or a marriage of 20 or more years, the court, in its discretion, shall order maintenance for a period equal to the length of the marriage or for an indefinite term." *Id.*

¶ 170                     b. Whether Nawara's $145,000 Was a Gift, Not Income

¶ 171   Frank contends that the trial court erred in failing to include $145,000 in gifts from Nawara's family as income for maintenance calculations. According to Frank, Illinois law is clear that gift income is still "income" under the Act, even in the event of a one-time gift, citing: *In re Marriage of Dahm-Schell and Schell*, 2021 IL 126802; *In re Marriage of Rogers*, 213 Ill. 2d 129

(2004); *In re Marriage of Verhines & Hickey*, 2018 IL App (2d) 171034; and *In re Marriage of Walker*, 386 Ill. App. 3d 1034 (2008), in support. Frank points out that Nawara received at least $30,000 from her godfather, thus indicating that this was not a one-time event.

¶ 172    Nawara responds that the "two isolated gifts" from her family do not constitute "income" pursuant to our supreme court's decision in *Rogers*, and instead proffers *In re Marriage of Brill*, 2017 IL App (2d) 160604, as more applicable. Specifically, Nawara points out that the gifts in *Rogers* were annual gifts over many years which constituted "dependable annual income," whereas here, the gifts she received from her mother and godfather were funds used to support her after Frank refused to contribute to her expenses. Nawara further argues that there is no evidence that her family will continue to assist her throughout the rest of her adult life.

¶ 173    The issue of the $145,000 was first considered by the trial court following Frank's motion to reconsider, after he raised the issue in his reply brief. Therein, the court rejected Frank's argument that the money should have been included in Nawara's income computation, as it characterized the $145,000 as a "one-time thing" and that Nawara was not "counting on a monthly subsidy from her family" in order for it to be considered income. The court further distinguished the $145,000 from that of regular gifts as discussed in the case of *In re Marriage of Ruvola*, 2017 IL App (2d) 160737.

¶ 174    Determination of what constitutes a gift versus what is income is, unfortunately, another twist and turn of various overlapping statutory provisions and Illinois case law, notwithstanding the various amendments to the statute that have occurred multiple times throughout the years. Preliminarily, because whether an item constitutes income for purposes of maintenance is determined based on the statute's pronouncements, we review the trial court's determination here on a *de novo* basis. *Ruvola*, 2017 IL App (2d) 160737, ¶ 18.

¶ 175   As noted prior, Section 504 of the Act governs entitlement to maintenance based on a variety of factors, such as "the *income* and *property* of each party, including marital property apportioned and non-marital property assigned" (750 ILCS 5/504(a)(1) (West 2016) (emphasis added)), and "all sources of public and private income including, without limitation, disability and retirement income." 750 ILCS 5/504(a)(10) (West 2016). Maintenance awards are further determined by the "*gross annual income*" and "*net annual income*" of the parties. (Emphasis added.) See 750 ILCS 5/504(b-1)(1), 504(b-1)(1)(A) (West 2016). We turn first to those statutory definitions to begin our inquiry.

¶ 176                                   *i. Gifts and Property*

¶ 177   Section 504 does not define "property" on its own. However, we know that section 503, which governs the distribution of the marital estate, provides some clues as to what is marital and non-marital property, and we must presume that the legislature intended these two sections to be read together harmoniously. See *In re Jarquan B*, 2017 IL 121483, ¶ 34 (collecting cases espousing well-established principle that courts have a duty to interpret statutes in a manner that avoids an inconsistency and gives effect to both, where such an interpretation is reasonably possible). However, we are also mindful that section 504's definition of "property and income" may indeed be more expansive than just marital and non-marital property, given that the two are listed after the clause "including" in section 504(a)(1). Thus, we may resort to dictionary definitions as further guides for interpretation if need be. See *People v. Chapman*, 2012 IL 111896, ¶ 24 ("When a statute contains a term that is not specifically defined, it is entirely appropriate to look to the dictionary to ascertain the plain and ordinary meaning of the term.").

¶ 178   With these principles in mind, we turn to section 503. "Non-marital property" is defined therein, with section 503(a)(1) stating that non-marital property is "property acquired by *gift,*

legacy or descent or property exchanged for such property[.]" (Emphasis added.) 750 ILCS 5/503(a)(1) (West 2016). "A valid gift requires proof of donative intent and delivery of subject matter," and "[d]onative intent is often presumed if the transfer was from a parent to a child." *Schmidt*, 242 Ill. App. 3d at 968. However, there is a "conflicting presumption" under the Act if such a gift is acquired after the marriage. *Id.* A party must defeat the presumption of the gift being characterized as marital property through clear and convincing evidence. 750 ILCS 5/503(b)(1) (West 2016).

¶ 179   Notably, courts have been "rightly skeptical" of gifts that include "transfers by the parents of one of the litigants in a dissolution case," as "there is an incentive for both sides of the transfer, the parents making it and the litigant receiving it, to conform their testimony to the disadvantage of the other litigant." *Schmidt*, 242 Ill. App. 3d at 968. "Transfers where the parents would never have sought repayment, if the marriage had remained intact, may be viewed from a different perspective when the marriage falls apart." *Id.* Further, "[i]f such a transfer were a gift it could be a gift to the marriage, thereby resulting in marital property, or it could be a gift to only one of the litigants, thereby resulting in nonmarital property." *Id.* at 968-69.

¶ 180                                                 *ii. "Income"*

¶ 181   Looking towards the meaning of "income," again, the statute does not provide a standalone definition, but the terms "gross income" and "net income" are defined in section 504. "Gross income" is defined as "all income from all sources, within the scope of that phrase in Section 505 of the Act, except maintenance payments in the pending proceedings[.]" 750 ILCS 5/504(b-3) (West 2016). "Net income" is defined similarly with reference to section 505, stating that it has "the meaning provided in section 505 of this Act, except maintenance payments in the pending

proceedings shall not be included." 750 ILCS 5/503(b-3.5) (West 2016). Thus, we must look to section 505 to further supplement section 504's definitions.

¶ 182   Section 505 is within the same statutory scheme, but expressly governs child support obligations that often run in tandem with dissolution proceedings. See 750 ILCS 5/505 (West 2016). It also does not provide a standalone definition of "income," but like section 504, its current version defines "gross income" and "net income."[33]

¶ 183   Section 505(a)(3)(A) provides:

> "As used in this Section, 'gross income' means the total of all income from all sources, except 'gross income' does not include: (i) benefits received by the parent from means-tested public assistance programs *** or (ii) benefits and income received by the parent for other children in the household, including, but not limited to, child support, survivor benefits, and foster care payments. *** *** ***. 'Gross income' includes maintenance treated as taxable income for federal tax purposes to the payee and received pursuant to a court order in the pending proceedings or any other proceedings and shall be included in the payee's gross income for purposes of calculating the parent's child support obligations." 750 ILCS 5/503(a)(3)(A) (West 2022).

¶ 184   "Gross income" is then used to determine "net income," which is defined in section 503(a)(3)(B) as:

---

[33]Notably, the 2016 version of the statute did not include a differentiation between "gross" and "net" income; rather, only "net income" was defined. In 2017, the statute was amended to specifically define the two terms. See Pub. Act 99-764, § 5 (eff. July 1, 2017) (amending 750 ILCS 5/505(a)(3); see also Pub. Act 100-15, § 5 (eff. July 1, 2017) (same, with some clarifications). These provisions were further amended again by Pub. Act 100-923, § 10 (eff. Jan. 1, 2019) (amending 750 ILCS 5/505(a)(3) to further define "net income"). All major changes to this provision were in effect at the time the court calculated its maintenance determinations here.

"Gross income minus the standardized tax amount calculated pursuant to [section 503(a)(3)(C)] or the individualized tax amount calculated pursuant to [section 503(a)(3)(D)], and minus any adjustments pursuant to [section 503(a)(3)(F)]. *** 'Net income' includes maintenance not includable in the gross taxable income of the payee for federal income tax purposes *** and shall be included in the payee's net income for purposes of calculating the parent's child support obligations." 750 ILCS 5/505(a)(3)(B) (West 2022).

¶ 185  Given the highly technical and dense nature of these statutory definitions, as well as the various overlapping provisions, we are fortunate that our supreme court has provided guidance on this issue, beginning with whether gifts received by a payor of child support maintenance could constitute "income" for purposes of maintenance obligations pursuant to section 505. Specifically, in *In re Marriage of Rogers*, 213 Ill. 2d 129 (2004), our court considered whether the definition of "net income" under a prior version of section 505 could include loans and gifts received by the payor spouse from his family, which would then in turn affect his child support obligations. *Id.* at 135. The court first observed that, per the statute, in order to calculate "net income," it needed to ascertain "the total of all income from all sources" received by the parent. *Id.* at 136. Because the statute did not separately define "income," the court looked to the word's plain and ordinary meaning. *Id.* The court referenced various dictionaries, which defined "income" as "something that comes in as an increment or addition," "a gain or recurrent benefit that is usually measured in money," "the value of goods and services received by an individual in a given period of time," and as "the money or other form of payment that one receives, usually periodically, from employment, business, investments, royalties, gifts and the like." *Id.* at 136-37. The court further compared the definition of "income" under section 505(a)(3) to that contained in the Internal Revenue Code, and

determined that items that would be considered taxable under the child support statute would not be ordinarily taxable at the federal level. *Id.* at 137.

¶ 186 Thus, based on its reading of the statute and the former definitions, our supreme court ultimately concluded that the father's gifts that he received from his parents constituted "income," and subsequently, "net income," for purposes of child support calculations. *Id.* The court reasoned that even if the gifts may not be subject to federal taxation, the gifts nonetheless "represented a valuable benefit to the father that enhanced his wealth and facilitated his ability to support" his children. *Id.* The court further rejected the father's argument that there was no guarantee that he would continue to receive such monetary gifts in the future, because "[f]ew, if any sources of income are certain to continue unchanged year in and year out" and that "people can lose their jobs, interest rates can fall, [and] business conditions can wipe out profits and dividends." *Id.* at 138. The court observed that the "relevant focus under section 505 [was] the parent's economic situation at the time the child support calculations [were] made by the court[,]" and that its review of the record showed, by the father's own testimony, that the gifts from his parents "represent[ed] a steady source of dependable annual income *** he ha[d] received over the course of his adult life." *Id.* Moreover, the court continued, "the nonrecurring nature of an income stream is not irrelevant." *Id.* at 139. Indeed, the court stated that if there was evidence to show that a parent was unlikely to receive such payments in the future, the court was able to consider that and deviate from the statutory guidelines if need be, citing to the 2002 version of section 505(a)(2). *Id.* Finally, the court noted that such payments could be modified pursuant to section 510 of the statute. *Id.*

¶ 187 Following *Rogers*, our supreme court expanded its definition of "income" in child support proceedings to that of maintenance obligations in *In re Marriage of Dahm-Schell and Schell*, 2021 IL 126802. The court considered a certified question and an issue of first impression, namely

whether "mandatory distributions or withdrawals from an inherited retirement account (IRA) that ha[d] never been imputed against the recipient for the purposes of maintenance and child support calculations constitute 'income' under 750 ILCS 5/504(b-3) (West 2018) and 750 ILCS 5/505(a)(3) (West 2018)." *Id.* ¶ 32.

¶ 188 Preliminarily, the court observed that the term "income" had been held by courts to be a "broad and expansive definition." *Id.* ¶ 39. Further, the court stated that the term " 'income' has the same meaning with regard to maintenance and child support" because the statutory definition of "gross income" for maintenance purposes pursuant to section 504(b-3) was virtually the same as the definition of "net income" for child support purposes under section 505(a)(3). *Id.* The court also cited approvingly its previous definitions of "income" in *Rogers*, including the fact that gift payments, even when non-recurring, could still support a finding of it being income. *Id.* ¶ 40. Ultimately, the court determined that the inherited IRAs "were a gain and benefit" to the father, which "facilitated his ability to meet his child support and maintenance obligations." *Id.* ¶ 54. As such, the court determined that "the receipt of mandatory distributions and withdrawals from the inherited IRAs" were included in the "statutory definition of 'income' for purposes of calculating his support obligations" for both child support and maintenance. *Id.*

¶ 189 Our takeaway from *Rogers* and *Dahm-Schell* is that the definition of "income" is broad, and that the recurring, or nonrecurring nature, of a given money source is relevant to the extent which the court deems it so, based on the circumstances of the individual case. However, the parties point us to two additional cases that they deem relevant to our resolution of whether the $145,000 must be counted in Frank's maintenance calculations, both of which were issued only a few weeks apart and prior to *In re Marriage of Dahm-Schell*. See *In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶ 19 (noting that at the time, *Rogers* had only addressed child support

obligations pursuant to section 505(a)(3) of the Act, versus maintenance obligations pursuant to section 504(b-1)(1)); *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶¶ 35-39 (distinguishing *Rogers* based on its assessment of child support obligations, not maintenance, but nevertheless, finding that gifts received by the payee spouse were considered for purposes of income and support calculations). However, as *Dahm-Schell* further clarified thereafter, the definitions of "income" under either statute are virtually the same, and thus we still find both cases' discussion of gifts and income persuasive to our resolution here. We turn first to *Ruvola*, which was relied upon by the trial court here in its decision regarding the $145,000.

¶ 190   In *Ruvola*, the ex-wife and receiver of maintenance payments testified that she had received weekly checks of $255 in gifts from her father, which amounted to about $13,260 per year and which she did not always report as income. 2017 IL App (2d) 160737, ¶¶ 14-15. On appeal, the appellate court agreed with appellant husband that the trial court had failed to include the father's weekly checks into its calculation of the wife's yearly gross income for purposes of maintenance calculations based on its reading of the statute and our supreme court's holding in *Rogers*. *Id.* ¶¶ 18, 20.

¶ 191   In *Brill*, the appellant husband challenged his maintenance obligations to his ex-wife on similar grounds, namely that the trial court failed to consider that she received $15,349 annually from her parents. 2017 IL App (2d) 160737, ¶ 33. The appellate court rejected this claim, finding that the court had considered the money received from his ex-wife's parents when it calculated the duration of the maintenance award. *Id.* ¶¶ 34-35. The *Ruvola* court noted that, if the trial court had strictly adhered to the statutory maintenance guidelines, the ex-wife should have received maintenance for 270 months. *Id.* ¶ 35. Instead, the trial court used its discretion and deviated downward from the guidelines to 96 months, and expressly noted that its decision to do so was, in

part, based on the financial assistance received from her parents. *Id.* ¶ 35. However, the court rejected the appellant's contention that his case was akin to *Rogers*, as there was no evidence that the ex-wife's parents "had provided her with financial assistance every year of her entire adult life" and thus did not display the "steady source of dependable annual income" found in *Rogers. Id.* ¶ 36.

¶ 192    Returning to our case, the trial court determined that the combined $145,000 given to Nawara by her mother and her godfather did not constitute income for purposes of maintenance because, according to the court, the gifts were a "a one-time thing" and Nawara was not expecting to receive a monthly subsidy from her family. The record reflects that Nawara received two gifts from her mother and godfather during dissolution proceedings that totaled $145,000. However, it was also Nawara's testimony that she had received other monetary gifts from her family during the course of the marriage prior to the filing of her petition, which was $99,985 from her father in November 2006; $9,965 from her godfather sometime in 2012; and another $19,000 from her godfather in December 2012. Nawara further denied receipt of an additional $30,000 from her godfather, and there is no additional testimony in the record regarding the purpose of those transfers during a time period where the marriage was likely still intact.

¶ 193    Thus, on the one hand, it appears that Nawara received some money from her family prior to the beginning of dissolution proceedings, some of which was received prior to her beginning work at J Discount. However, the $145,000 she received in 2017 and 2018, were received after she lost her job and during the time in which she was not apparently receiving any financial support from Frank. Thus, although she perhaps received more than the $145,000 over a period of time from her family, they do not appear in such a recurring nature as the weekly gifts discussed in *Ruvola*, and from our view, do not appear as a reliable source of annual income for Nawara

throughout the duration of the marriage as in *Rogers*. Indeed, the large sum of money did not operate to "enhance [Nawara's wealth]" as she was unemployed at the time, did not have a retirement account, and became responsible for the home equity mortgage in 2016. See *Rogers*, 213 Ill. 2d at 137. When balanced against Nawara's testimony of attempting to find employment, which we will discuss later, it appears that Nawara herself did not expect further assistance from her family. This is significant, because even if a gift could more or less be deemed to be "recurring" in nature, our supreme court in *Rogers* has said that the "relevant focus" for support calculations is the "economic situation at the time" the calculations are made. *Id.* at 138. Here, the record demonstrated Nawara's overall financial status, in which she was unemployed and basically reliant on her maintenance payments and the $145,000 given to her by her family.

¶ 194    Further, although the court did not make express credibility determinations in either of its orders, it nevertheless found Nawara to be a candidate for maintenance twice, and we will not substitute our judgment for that of the trial court which sits in the best position of evaluating witness testimony and credibility. See *Walker*, 386 Ill. App. 3d at 1042 (deferring to the trial court's finding that husband's testimony was not credible where he testified that his receipt of a $31,200 bonus was 'unusual' and a 'one-time thing' based on his receipt of other bonuses throughout the years). There is sufficient evidence in the record that the $145,000 was properly determined to be a gift that was not recurring enough in nature to be considered income for purposes of maintenance calculations. Accordingly, we do not find that the trial court erred in excluding the $145,000 from Nawara's overall income calculation for purposes of assigning Frank's maintenance obligations.

¶ 195    c. Whether the Trial Court Correctly Imputed an Income of $25,000 to Nawara

¶ 196    Next, Frank contends that the trial court erred by not considering Nawara's earning potential as a licensed Illinois pharmacist for her income imputation. Frank points out that the evidence showed that Nawara had previously made around $60,000 annually during various parts of their marriage, and it was her own testimony that pharmacists had the potential to earn between $70,000 to $110,000 a year. Frank argues that the court also failed to consider that Nawara was unemployed based on lackluster attempts to find a job, and that the court attempted to rationalize Nawara's unemployment by referencing the COVID-19 pandemic and "present economic downturn."

¶ 197    Nawara responds that the evidence supports an income imputation of $25,000. She points out that she had been a homemaker with only four years of lifetime employment; had never had a paying job in Syria or prior to marrying Frank; she did not begin to work as a pharmacist in Illinois until December 2012; she lost her job in 2016 when the pharmacy closed; and has since only had occasional work as a substitute pharmacist. Nawara further references her documented efforts to acquire employment, as well as various statistics provided by the U.S. Department of Labor indicating a negative employment outlook for pharmacists in the United States.

¶ 198    We return to the statute. Section 504(b-2)(2) authorizes the trial court to deviate from the guideline amount of maintenance based on a variety of factors, one such being the respective earning capacities of the parties. 750 ILCS 5/504(b-1)(1) (West 2016), *Id.* § 504(b-1)(2), *Id.* § 504(b-2)(2), *Id.* § 504(a)(3). As the trial court did here, a court may impute income to a party upon a finding that "the party is voluntarily unemployed, is attempting to evade a support obligation, or has unreasonably failed to take advantage of an employment opportunity." *Ruvola*, 2017 IL App (2d) 160737, ¶ 39 (quoting *In re Parentage of M.M.*, 2015 IL App (2d) 140772, ¶ 44)). A court may also impute income in cases of voluntary unemployment or *under*employment. *Id.* "The

amount of income imputed by the court must be supported by evidence showing that it is commensurate with the *** skills and experience" of the recipient, including income from previous employment. *In re Marriage of Van Hoveln*, 2018 IL App (4th) 180112, ¶ 40. "However, a court should not base its income calculation on outdated data that no longer reflect prospective income." *Id.* (quoting *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 47). The decision to impute income is reviewed under an abuse of discretion standard. *Id.* ¶ 43.

¶ 199   The trial court first imputed an income of $25,000 to Nawara following the hearing for temporary maintenance, based on "the limited information [it had] from the respondent [and] *** petitioner, the arguments by counsel, the financial affidavits, and the verified pleadings." There, the court made no mention as to whether it believed Nawara was voluntarily unemployed or underemployed. Later in its dissolution judgment, although it deemed Nawara a "candidate for continuing maintenance," it did not expressly impute any income to her for maintenance purposes, although the parties considered this to be an imputation of $0. Further, the court's determination that maintenance was proper was based on its evaluation of factors under section 503(d), and not section 504, which expressly governs maintenance calculations. However, the court found that "Nawara has very little employment history and is at a significant disadvantage in relation to her future employment prospects given her age, relative lack of work history, and the present economic downturn, whereas Frank has been employed at a considerable income for most of his entire adult life." It further found that:

> " *** [A]t present, Nawara is 53 years old and Frank is 64 years old. While Frank has been employed throughout his entire adult life, and was able to purchase three properties in addition to Unit A *** during the parties' marriage, Nawara was a homemaker for the majority of their marriage, accumulating a work history of only a few years as a

pharmacist and having considerable difficulty in securing new employment given her age, relative lack of work history, overall absence from the workforce during the parties' marriage, and the economic pressures pertaining to her occupation specifically and to the economy and workforce more broadly, particularly during this year with the COVID-19 pandemic."

¶ 200   With regard to the parties' reasonable opportunities for future acquisition of capital assets and income, the court found:

" *** Frank is nearing retirement age; however, he has worked during his entire adult life for a considerable income and also has considerable retirement assets. On the contrary, and as this [c]ourt has explained above, neither circumstance applies to Nawara, and given her age, relative lack of work history, overall absence from the workforce during the parties' marriage, and the economic pressures pertaining to her occupation and to the economy and workforce more broadly, particularly during this year with the COVID-19 pandemic, this [c]ourt finds that Nawara does not have a reasonable opportunity, in the absence of the provisions of these distribution and maintenance arrangements, to acquire capital assets and income."

¶ 201   In its order addressing Frank's motion to reconsider, the court clarified numerous items in its dissolution judgment, where it admitted that its maintenance determination was "absen[t]" and had "effectively imputed a zero income" to Nawara, thus conflicting with its previous imputation. As such, the court reverted to its previous determination, and noted that despite its finding that Nawara was "unemployed," it had "[n]evertheless *** impute[d] to Nawara an annual income of $25,000." Again, the court did not expressly detail why it believed $25,000 to be an appropriate imputation.

¶ 202    We turn to the record. On May 6, 2016, prior to her termination from J Discount, Nawara filed a "Disclosure Statement," which indicated that she had $59,456 in gross income in the previous year, with an annual monthly gross income of $5,200. She also asserted that she was paying $1,700 a month on a mortgage, as well as $682 in real estate taxes and $333 in assessments. She further listed out other household and personal expenses. After calculating the difference between her monthly income and total living expenses, she estimated her available income per month as "-$1,257." She listed her bank accounts but did not have any investment accounts, and only claimed the two Hinman properties (Unit A and B) and the Lakeview property as real property assets.

¶ 203    Three years later, in her motion for temporary maintenance, Nawara's affidavit averred that: she was currently unemployed; had never had a paying job in Syria or prior to the parties' marriage; did not become a licensed pharmacist until 2008 following a three-year process to become qualified; her first paying job was at J Discount in 2015; the pharmacy had closed in December 2016; and she had applied for many pharmacy jobs without success since. Her testimony at trial confirmed her limited work experience, with the exception that she had occasionally been able to obtain short-term work, and had not filed any recent federal tax returns due to her lack of employment. Nawara's 2019 financial affidavit further averred that she had received $626 on her 2017 federal tax return, had zero monthly income, and incurred about $5,105 in monthly household and personal expenses, as well as $625 in health insurance costs. Her total combined assets were about $200,000 in her checking and savings accounts, including the proceeds of the sale from Unit B.

¶ 204    With regard to her efforts to find employment, Nawara submitted her resume and various documents supporting her efforts to find work following her termination from J Discount in

December 2016. The record reflects applications to employers such as Presence Health, Walgreens, North Shore University Health System, Ascension, and Shriner's Hospital over the course of three years or so. Documents were also submitted demonstrating career coaching and Linkedin activities, as well as Nawara's tracking of job-related efforts where she was unable to provide confirmation of her application. At trial, Nawara admitted that she was not able to provide evidence of every job she applied for, but began documenting more of her efforts after consultation with her attorney. She also indicated that she was only seeking work as a pharmacist, and not as a technician as she no longer held that license.

¶ 205    Frank attempted to rebut Nawara's income and employment history at trial. He testified to Nawara having a job in Syria during an undefined time period, which was unsupported by any other evidence in the record and which Nawara further denied during her examination. He also testified to conversations with Nawara in which she was apparently adverse to the prospect of employment, which Nawara also denied. Finally, Frank also attempted to show that Nawara's efforts in procuring employment were less than satisfactory, and that she could have mitigated her lack of income by applying for unemployment insurance. To that end, Nawara testified that she had been unaware that she was eligible for such benefits.

¶ 206    Although the trial court did not make any express credibility determinations in either of its orders, based on its factual findings, it appeared to find Nawara credible regarding her efforts to find employment and desire to work, over Frank's testimony concerning Nawara's resistance to finding employment throughout the marriage. Again, we see no discernible reason to disturb these implicit findings. See *Walker*, 386 Ill. App. 3d at 1042 (trier of fact is charged with assessing a witness's testimony and credibility at trial, and is in the best position to observe their conduct and demeanor). Further, although the record is unclear as to why Nawara was first imputed an income

of $25,000, we acknowledge that such a proceeding is summary in nature and the trial court expressly noted that its determination was based on the information it had at the time. See 750 ILCS 5/501(a)(3) (West 2016). At trial, the record was far more developed with regard to the parties' financial statuses and Nawara's efforts to find employment. The trial court appeared to briefly believe that the correct imputation was $0, but nevertheless chose to reverse itself to maintain its original finding. This could perhaps be attributable to the fact that Nawara has had some history of employment in a fairly professionalized field, which the court may have taken into account. See *Evanoff & Tomasek*, 2016 IL App (1st) 150017, ¶ 29 (reiterating that it is within the trial court's discretion to consider prior years of income or average income of previous years of employment for purposes of support calculations); but see also *Van Hoveln*, 2018 IL App (4th) 180112, ¶ 40 (trial court should not base its income calculations on outdated data that no longer reflects prospective income).

¶ 207   What is clear is the court's findings that, when considering Nawara's age, very few years of work history, even if specialized, difficulty in finding a job over the course of many years, and the fact that Frank had been able to acquire assets during the marriage whereas she had not, Nawara did not possess the same reasonable opportunities as Frank to acquire further assets and income in order to "maintain the standard of living enjoyed during the marriage." *Johnson*, 2016 IL App (5th) 140479, ¶ 79; see also *Heroy*, 385 Ill. App. 3d at 657 (trial court properly considered maintenance recipient's employment prospects, where even though ex-wife possessed a law degree, she was fifty-six years old, had never practiced law and worked instead as a law librarian, and had not been employed formally for about twenty years); compare *Ruvola*, 2017 IL App (2d) 160737, ¶¶ 42-44 (trial court justified in finding that maintenance recipient was voluntarily

underemployed based on failure to seek a position within their respective field of work and failure to provide evidence of job search attempts).

¶ 208 Moreover, the court's observations support the inference that Nawara's maintenance award was permanent, rather than rehabilitative in nature, which justifies the lower income imputation. See *In re Marriage of Selinger*, 351 Ill. App. 3d 611, 619 (2004) ("A permanent maintenance award is justified where the spouse has employment skills[,] but there is a discrepancy between *** probable future income and the amount of income that would provide the standard of living *** enjoyed while married."); *Johnson*, 2016 IL App (5th) 140479, ¶ 93 (concept of rehabilitative maintenance is to renew or develop skills to re-enter the job market in order to become self-sufficient, versus permanent maintenance where spouse has devoted significant time to raising a family instead of pursuing a career); compare *In re Marriage of Schuster*, 224 Ill. App. 3d 958, 970-71 (1992) (trial court correctly denied request for rehabilitative maintenance where recipient was thirty-two years old, chose to not pursue work because he did not enjoy it, and held various professional degrees).

¶ 209 Thus, on balance, we find that the trial court's imputation of $25,000 in income to Nawara for purposes of maintenance calculations was not unreasonable. The record supports a clear disparity between the parties with regard to income, future acquisition of capital and assets, and employment prospects. See *In re Marriage of Wojcik*, 2018 IL App (1st) 170625, ¶¶ 37-39 (rejecting maintenance payor's argument that lower-earning spouse could have earned more money over time, and affirming income imputation of $46,000, in part, where the evidence showed that the spouse could never achieve the level of income to maintain the lifestyle the parties enjoyed during the marriage). As such, we also affirm the court's finding on this basis.

¶ 210     4. Whether the Trial Court Properly Ordered Retroactive Temporary Maintenance

¶ 211   Next, Frank argues that the court's ruling requiring him to pay retroactive maintenance was also in error. First, Frank contends that the court improperly ordered retroactive maintenance to be paid from the date of the petition's filing, while also simultaneously acknowledging that recent Illinois law holds that a trial court has authority to order retroactive maintenance to the date of the petition, citing *In re Marriage of Hochstatter*, 2020 IL App (3d) 190132. Nevertheless, Frank argues that the effective date for retroactivity should not begin until after he received proper notice of the petition and filed an appearance thereafter, citing 750 ILCS 5/510(a) and *In re Marriage of Hawking*, 240 Ill. App. 3d 419 (1992), in support. Frank also points out that Nawara was employed at the time her petition was filed, and that she waited two and a half years after she became unemployed to file her request for temporary maintenance.

¶ 212   Even assuming the court had authority to order retroactive maintenance to the date that it did, Frank further contends that the temporary order was also subject to readjustment at the time of final judgment pursuant to section 501 of the Act. Frank points out that the court modified its permanent maintenance award based on considerations of Nawara's income imputation, as well as his own income figures. However, despite these changes, Frank notes that the court did not modify its retroactive award based on the new income values, and also did not credit him for the difference of what he paid pursuant to temporary order ($2,355 per month) and what he is now obligated to pay after final order ($1,973.12 per month). Finally, Frank contends that the retroactive award must be paid out of marital funds, rather than his post-division share as set forth in *In re Marriage of Heroy*, 385 Ill. App. 3d 640 (2008).

¶ 213   Nawara responds that the court's ruling was proper. Preliminarily, Nawara notes that Frank's argument that she had been working at the time the petition was filed was never raised and is therefore waived. Nawara also contends that any objection to the calculation of previously

ordered maintenance was also waived because Frank did not raise it in his motion to reconsider. Substantively, Nawara contends that Illinois law is clear that the court can order retroactive maintenance to the date of the petition's filing, and that the award is supported by the record where Frank failed to provide her with any living expenses until June 2019, after the temporary order for maintenance was entered. Last, Nawara agrees that *Heroy* stands for the proposition that retroactive maintenance should be funded from the marital estate, but Nawara points out that Frank had not been utilizing any marital earnings to support her since 2016.

¶ 214    We first address Nawara's waiver argument, and find it misplaced. In his motion to reconsider, Frank challenged the retroactive maintenance award on the basis that Nawara had been employed when the petition was first filed, that she had some part-time employment after she was let go from J Discount, and had not mitigated her income with unemployment insurance. Thus, this challenge was appropriately raised prior to appeal.

¶ 215    We turn to the relevant provision of the Act. As noted briefly prior, Section 501 allows the trial court to enter a temporary maintenance award prior to the entry of a dissolution judgment. 750 ILCS 5/501 (West 2016). Notably, section 501 does not expressly incorporate the statutory factors contained in section 504's maintenance assessment. However, "the trial court must consider the entire financial situation of both parties," and the award must be based on "a showing of the parties' incomes and assets[,] and what is required to support the party seeking maintenance." *Burdess*, 2020 IL App (3d) 190342, ¶ 31. The trial court, in its discretion, may also credit any term of temporary maintenance paid by court order to be a credit to a parties' overall maintenance obligation following dissolution. 750 ILCS 5/504(b-1)(1.5) (West 2016).

¶ 216    Either party may petition for such maintenance, and must accompany the request with a financial affidavit outlining the purpose for the requested relief. 750 ILCS 5/501(a)(1) (West

2016). The request must also be supported by documentary evidence, "including, but not limited to, income tax returns, pay stubs, and banking statements." *Id.* Temporary maintenance proceedings are adjudicated on a "summary basis," as they are based on documentary evidence unless the court, upon a showing of good cause, deems it necessary to hold an evidentiary hearing. 750 ILCS 5/501(a)(3) (West 2016). A temporary maintenance award is not intended to "prejudice the rights of the parties" prior to final adjudication and thus terminates once a final judgment is entered. 750 ILCS 5/501(d)(1), (d)(3) (West 2016).

¶ 217   "One of the principal purposes of granting temporary maintenance *** is to attempt to balance the equities between the parties as fairly as possible while the dissolution case is pending." *In re Marriage of Hochstatter*, 2020 IL App (3d) 190132, ¶ 16. An award for temporary maintenance is "merely a stopgap that lasts only until a court finally resolves the pending question[] of maintenance[.]" *Id.* "Temporary maintenance awards, including their retroactivity, are matters for the trial court's discretion." *Chapa*, 2022 IL App (2d) 210772, ¶ 58. As trial courts have "wide latitude" in entering a temporary order, a reviewing court will not reverse such a finding absent an abuse of discretion. *In re Marriage of Greenberg*, 102 Ill. App. 3d 938, 941 (1981) (quoting and citing *In re Marriage of Simmons*, 87 Ill. App. 3d 651, 657-58 (1980)). However, as to whether the trial court has statutory authority to order retroactive maintenance from the date of the petition for dissolution, we review this challenge *de novo.* See *Rogers*, 213 Ill. 2d at 136; see also *Hochstatter*, 2020 IL App (3d) 190132, ¶ 14. A trial court is also generally limited to granting relief sought in the pleadings, but Nawara's petition sought maintenance from Frank at the outset. See *In re Marriage of Gowdy*, 352 Ill. App. 3d 301, 306 (2004).

¶ 218   We turn to the trial court's findings. In the court's dissolution judgment, the court found that "retroactive maintenance was appropriate" based on its consideration of the parties'

circumstances under section 503 of the Act. In its order addressing Frank's motion to reconsider, the court rejected Frank's argument that it had improperly granted retroactive maintenance. Specifically, the court stated:

> "Not only do the facts of the length of the parties['] marriage and the significant disparities in employment history and prospects between Frank and Nawara support the award of retroactive maintenance, but this [c]ourt finds that this is not a situation where retroactive maintenance was awarded despite the absence of any pleadings or discussion whatsoever of the prospect of an award of retroactive maintenance and/or was awarded after the parties executed a marital settlement agreement such that Frank was required to pay retroactive maintenance out of his 'post division share' of the marital estate. *See contra In re Marriage of Van Hoveln*, 2018 IL App (4th) 180112, ¶¶ 33, 46 ***[.]"

¶ 219 However, the court found that Frank was entitled to a credit or "set-off" of his maintenance obligation beginning November 1, 2020, with regard to the amounts he paid pursuant to the court's dissolution judgment, which were "in excess of the amounts ordered" in its new order.

¶ 220 Frank is correct that Illinois courts have held that a trial court has statutory and discretionary authority to award retroactive maintenance to the date of filing the petition. See *Hochstatter*, 2020 IL App (3d) 190132, ¶¶ 17-18; see also *Chapa*, 2022 IL App (2d) 210772, ¶ 58 (temporary maintenance awards, including their retroactivity, are matters for the trial court's discretion). Thus, at the outset, we can easily determine that the trial court's decision to award retroactive maintenance to the petition's filing is within the trial court's authority. Further, the

evidence shows that the award was warranted.[34] Both parties' testimony revealed that, with the exception of the home equity loan and some utility bills, Frank did not contribute any money towards Nawara's expenses or the household after he moved out of Unit A in September or October 2015, which consequently was also around the time Nawara's petition was filed. Thus, even if she was employed until December 2016, there was a huge discrepancy in her day-to-day living expenses, which, by Frank's own testimony, he had been primarily responsible for during their marriage, even while Nawara had been employed. The court's retroactive maintenance award thus served the overall purpose of temporary maintenance, which operates as a "stopgap that lasts until the court finally resolves the pending questions of maintenance[.]" *Hochstatter*, 2020 IL App (3d) 190132, ¶ 17.

¶ 221   Now, we consider Frank's arguments regarding the trial court's alleged errors in computing the retroactive maintenance amount. Frank contends that because his permanent maintenance award was modified based on Nawara's income imputation of $25,000, so should the retroactive amount. Frank's argument is misplaced. The temporary maintenance award was already based on an income imputation of $25,000, and as such this would not affect the amount of the award in that regard.

¶ 222   Next, Frank argues that because his income was revised from $110,840 to $96,693.66 in the order addressing his motion to reconsider, the retroactive amount should also be revised accordingly. Frank's determined income of $96,693.66 was an average calculated by the trial court based on Frank's 2016, 2017, and 2018 tax returns ($92,874; $97,009, and $100,198, respectively).

---

[34]We observe that after the entry of the temporary maintenance award, Frank moved to modify the award based on an incorrect salary computation. However, it does not appear that the motion was ever ruled upon, perhaps because it was filed very close in time to the start of trial.

The temporary maintenance award was entered on May 23, 2019. During those proceedings, petitioner's counsel stated in open court that he only had been provided with Frank's 2016 financial affidavit, and respondent's counsel attempted to have Frank testify to his current financial status. The court admonished counsel, reminding him that a temporary proceeding was summary in nature, and that both parties had failed to provide the court with updated financial information as required by both the Act and local court rules. As such, the court entered an award based on the information available at the time, which was his 2016 financial information, and thus the court was unable to average out his income in the way it did after trial. Although the court did not specify how it came to that exact number, the calculation of the maintenance award is within the discretion of the trial court, and will not be disturbed unless its findings were clearly against the manifest weight of the evidence. See *Walker*, 386 Ill. App. 3d at 1041.

¶ 223   Finally, even if the amount could have been revised prior to trial, it was incumbent upon Frank to seek a ruling on his motion to modify his maintenance payments, and the record reflects that he did not, despite the lengthy amount of time in between various trial dates. As such, we do not find persuasive that the trial court's retroactive maintenance award should also be revised based on information it did not have at the time the order was entered. In that same vein, we also do not find that Frank is entitled to any "credit" for the difference in the retroactive award amount and what he will be paying prospectively after trial. Again, the trial court's ruling was based on the information it had at the time, and it did not have much of Frank's financial information utilized at trial to arrive at its permanent maintenance determinations.

¶ 224   However, we agree with Frank that any retroactive maintenance award should be paid out of the marital estate, as any temporary maintenance to Nawara was funded out of the marital estate prior to dissolution. As noted in *In Re Marriage of Lees*, 224 Ill. App. 3d 691 (1992):

> "[T]he issue of maintenance is interrelated with the distribution of marital property. [Citations omitted.] While recognizing that maintenance and distribution of property are considered together, they are clearly not the same thing. Maintenance is a sum of money payable to a spouse for his or her support. It is not the same as a distribution of property. *** In fixing a maintenance award, the court should consider the amount of property that it is distributing to each party. Nonetheless, maintenance and property distribution are two separate concepts which cannot be interchanged[.]" *Id.* at 694-95.

¶ 225 The temporary maintenance award was determined prior to dissolution, and thus before any division of marital property. Neither the dissolution judgment nor the court's order on Frank's motion to reconsider identifies the source from where the $101,265 in retroactive maintenance should be paid, but it may be inferred that it will be paid from Frank's post-division share of the marital property. At least one court has held that any retroactive temporary maintenance award should be funded out of the parties' marital estate, and although its reasoning for doing so is limited, we find it persuasive. See *Heroy*, 385 Ill. App. 3d at 660 (affirming retroactive maintenance award, but remanding to specify that such funds must be paid from the marital estate). Accordingly, we remand this issue to the trial court to clarify its order to reflect that the retroactive temporary maintenance award should be funded out of the parties' marital estate.

¶ 226                                   D. Motion to Reconsider

¶ 227 Frank argues that the trial court erred in partially denying his motion to reconsider the dissolution judgment with regard to its ruling on the $145,000 gift; the failure to modify the duration and amount of the retroactive maintenance award; and its ruling on the Notice of Dissipation. Nawara responds that Frank's arguments concerning his motion to reconsider are based on objections that he did not make before the trial court, and are simply reiterations of his

arguments here on appeal. We agree. As all of Frank's arguments concerning the motion to reconsider were already addressed on appeal, we need not address them further.

¶ 228                               E. Argument Contained in a Footnote

¶ 229    Finally, we observe that, within a footnote, Frank appears to accuse the trial court of making further legal error during trial, specifically with regard to an objection based on attorney-client privilege. To that end, in his request for relief, Frank seeks to have the case remanded to another judge. Nawara responds that Frank cannot point to any prejudicial trial conduct or evidence of personal bias. In reply, Frank shifts his previously footnoted argument to his argument section of his brief, and reiterates his request for a new judge upon possible remand.

¶ 230    Supreme Court Rule 341(a) discourages the use of footnotes in the parties' briefs. Ill. S. Ct. R. 341(a) (eff. Oct. 1, 2020). Further, with regard to a party's argument, "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); see also *Technology Solutions Co. v. Northrop Grumman Corp.*, 356 Ill. App. 3d 380, 382-84 (2005) (discussing importance of supreme court rules and striking *sua sponte* substantive arguments contained in footnotes in party's brief); see also *Lundy v. Farmers Group, Inc.*, 322 Ill. App. 3d 214, 218 (2001). As such, we will strike the footnote contained within Frank's opening brief and deem his argument contained within his reply brief as forfeited. We further note that our review of the record does not suggest any implication of bias by the trial court, but rather, a years-long dissolution proceeding delayed by both the parties and counsel of record over the course of almost six years.

¶ 231                               III. CONCLUSION

¶ 232    For the reasons stated, we affirm in part, reverse in part, and remand in part, and summarize our decision as follows. We affirm the trial court's: (1) designation of Nawara as a beneficiary on

Frank's life insurance policy; (2) finding that Frank is to reimburse Nawara for health insurance expenditures; (3) denial of the motion to reconsider with regard to the finding that the $145,000 did not constitute a gift; (4) refusal to modify the amount and duration of the retroactive maintenance award; and (5) substantive maintenance and retroactive maintenance awards in terms of amount and duration. We reverse and remand to the trial court to clarify the details of the retroactive temporary maintenance award so that the award should be paid out of the marital estate, and not Frank's post-division share. We also reverse the trial court's finding of dissipation as to the Delaware property in the amount of $35,525, as well as its subsequent finding in its motion to reconsider on this same issue. Upon remand, the trial court is directed to credit the $35,525 dissipation award back to Frank.

¶ 233   Affirmed in part; reversed in part; remanded in part.